**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 4, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MICHAEL LYNN CASH,

Defendant - Appellant.

Nos. 12-7072 and 12-7079

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. Nos. 6:11-CR-00057-JHP-1 & 6:11-CR-00028-JHP-1)**

---

William D. Lunn, Tulsa, Oklahoma, appearing for Appellant.

Christopher Wilson, Assistant United States Attorney (Mark F. Green, United States Attorney, Shannon L. Henson and Linda A. Epperley, Assistant United States Attorneys, on the brief), Office of the United States Attorney for the Eastern District of Oklahoma, Muskogee, Oklahoma, appearing for Appellee.

---

Before **KELLY, MATHESON,** and **BLACKBURN,**[*] Circuit Judges.

---

**MATHESON**, Circuit Judge.

---

[*] Honorable Robert E. Blackburn, District Court Judge, District of Colorado, sitting by designation.

On March 22, 2011, Defendant-Appellant Michael Lynn Cash was pulled over after Officer Timothy McEachern observed him commit a traffic violation. During the stop, Officer McEachern saw in plain view an artificial bladder device. He also learned that Mr. Cash was on the way to take a drug test for Steve Brittingham, his federal probation officer. Suspecting that Mr. Cash was planning on using the bladder device to defeat a urine drug test—a violation of Oklahoma state law—Officer McEachern detained him until Officer Brittingham arrived at the scene.

Shortly after Officer Brittingham arrived, he observed a firearm in plain view in the back seat of Mr. Cash's car—a clear violation of the terms of Mr. Cash's supervised release. A scuffle ensued in an effort to take Mr. Cash into custody and to render the firearm safe. Mr. Cash was eventually subdued and placed in the back of Officer McEachern's cruiser. He was not given warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966). The officers conducted an inventory search of Mr. Cash's vehicle and found methamphetamine, Lortab, and used syringes in addition to the firearm. In the meantime, Mr. Cash called Officer Brittingham over to the police cruiser and initiated a brief conversation with him. During this interaction, Mr. Cash told Officer Brittingham that he had been dealing drugs and feared for his life.

A federal grand jury indicted Mr. Cash on three counts: possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); possession of a firearm in furtherance of a drug trafficking crime in violation of 18

U.S.C. § 924(c)(1)(A); and as a felon in possession of firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Mr. Cash moved to suppress both (1) the physical evidence obtained from the search and (2) his statements to Officer Brittingham. The district court denied both motions, holding that neither Mr. Cash's Fourth nor Fifth Amendment rights were violated. Mr. Cash was convicted on all counts after a jury trial. He now appeals the district court's denial of both motions to suppress. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

Because Mr. Cash appeals "from the denial of motions to suppress, we recite the facts in the light most favorable to the government and accept the district court's findings of fact unless they are clearly erroneous." *United States v. Briggs*, 720 F.3d 1281, 1283 (10th Cir. 2013).

### A. *Factual History*

At approximately 3:30 p.m. on March 22, 2011, Officer McEachern, a patrol officer with the City of Durant Police Department, stopped Mr. Cash for a routine traffic violation. Roughly thirty minutes before the stop, Officer McEachern had been advised that several narcotics officers observed Mr. Cash's vehicle—a green Jeep Liberty— outside a known drug house. Officer McEachern was instructed to "develop his own [probable cause]" and pull Mr. Cash over. ROA, Vol. I at 64. At the time, Officer McEachern was aware that the vehicle belonged to Mr. Cash, and he learned through safety bulletins that Mr. Cash was known to use drugs and possess guns. Officer

-3-

McEachern also knew that Mr. Cash had previously been arrested for both possession of methamphetamine with intent to distribute and public intoxication.

When Officer McEachern observed the traffic violation, he activated the lights on his patrol cruiser ("cruiser").[1] After stopping Mr. Cash's vehicle, Officer McEachern notified the police dispatcher and approached Mr. Cash's vehicle. At the suppression hearing, Officer McEachern testified that he told Mr. Cash why he had been stopped and then asked for his driver's license and insurance verification. He also testified that he observed in plain view on the front passenger seat a device consisting of an elastic band with a rubber bladder, a tube, and a clamp, which he recognized from his prior experience as a device for defeating a urine drug test ("bladder device").

According to Officer McEachern, Mr. Cash told him that he was late for a urinalysis appointment with his federal probation officer, Steve Brittingham. Officer McEachern observed that Mr. Cash's behavior—"jittery, moving about, talking rapidly, seem[ing] very nervous"—was consistent with being under the influence of a controlled substance. ROA, Vol. I at 66.

Roughly 34 seconds into the video, Captain Chris Cicio, Officer McEachern's

---

[1] The video camera system in a police cruiser is designed to begin recording automatically upon activation of the car's lights. The video camera system in Officer McEachern's car, however, was not working properly. In particular, the magistrate judge found that the video recording "began approximately 30 seconds after" Officer McEachern activated the lights on his vehicle. ROA, Vol. I at 65. Moreover, the camera's audio did not function at all during the stop.

backup, arrived at the scene. Shortly thereafter, at 47 seconds into the video, Officer McEachern returned to his patrol cruiser to run a license check and fill out a citation. During this time, Officer McEachern could see Mr. Cash "fidgeting around" in the vehicle through Mr. Cash's rear window. ROA, Vol. I at 66. Based on Officer McEachern's prior experience, this behavior raised his concern for officer safety.

Approximately 4 minutes, 5 seconds into the video—after completing the citation and verifying that Mr. Cash's license, tag, and warrant checks were clear—Officer McEachern returned to the driver's side window of Mr. Cash's vehicle while Captain Cicio approached the passenger window. Rather than give Mr. Cash the citation, however, Officer McEachern asked Mr. Cash to exit the vehicle. Mr. Cash refused, telling Officer McEachern either to write him a ticket or let him go. He also informed Officer McEachern that he had to get to the Kiamichi Counseling Center for a drug test. Officer McEachern believed this statement conflicted with Mr. Cash's earlier statement that he was going to see Officer Brittingham. Mr. Cash also denied having any drugs or guns in the vehicle. When asked if Officer McEachern could search his vehicle, Mr. Cash declined consent, stating that he was already late.

Approximately 5 minutes, 47 seconds into the video, Officer McEachern determined that he needed Officer Brittingham at the scene. He returned to his car and radioed dispatch. Officer McEachern testified that he suspected that Mr. Cash was on his way to cheat a drug test (a violation of Oklahoma state law) and that Mr. Cash was under the influence of narcotics. Officer McEachern also testified that he wanted Officer

-5-

Brittingham to handle any parole violation; he stated that he would have given Mr. Cash a citation and let him go if Officer Brittingham had not come to the scene.

While waiting for Officer Brittingham's arrival—approximately 11 minutes, 30 seconds into the video—Officer McEachern convinced Mr. Cash to get out of the vehicle and patted him down for weapons. At this time, Officer McEachern informed Mr. Cash that he had seen the bladder device and asked Mr. Cash to sit on the curb behind the vehicle.

At 18 minutes, 45 seconds into the video, Officer Brittingham arrived. The three officers—McEachern, Cicio, and Brittingham—approached the passenger side of Mr. Cash's vehicle and looked in the unopened window. Officer Brittingham asked Mr. Cash to retrieve the device from the front seat. The passenger side door was locked, so Mr. Cash—at approximately 23 minutes, 29 seconds into the video—entered the driver's side of the vehicle, rolled down the passenger window, and handed Officer Brittingham the bladder device. Mr. Cash claimed that he did not know what the device was, why it was in his car, or who put it there. Officer Brittingham placed the device on top of Mr. Cash's car and called his superior to advise him of the situation.[2]

At this time, Officer McEachern noticed Mr. Cash pull a clear, Murine-brand eye drop bottle with yellow liquid inside from his pocket while he was searching for a

_____

[2] The terms of Mr. Cash's supervised release required that he allow his probation officer to visit him at any time at home or elsewhere and that he permit confiscation of any contraband the probation officer observed in plain view. ROA, Vol. II at 85.

cigarette. He asked Mr. Cash what was in the bottle, and Mr. Cash responded that it was Visine. When asked to hand it over to Office McEachern, Mr. Cash declined and stuck it back in his pocket. Officer McEachern testified that he suspected the bottle contained urine for use with the bladder device.

Still on the phone, Officer Brittingham observed what he thought to be the butt of a pistol under a gym bag on the back seat of Mr. Cash's vehicle. He motioned for Captain Cicio to come to him, communicated what he had just seen, and asked Captain Cicio to confirm the presence of a gun. After looking into the back seat, Captain Cicio yelled "gun!" He drew his service weapon and instructed Mr. Cash not to move. The officers told Mr. Cash to get out of the vehicle. After he failed to comply—at approximately 25 minutes, 30 seconds into the video—Officer McEachern pulled Mr. Cash out himself. Mr. Cash resisted by refusing to put his hands behind his back, and a struggle ensued.

Officer McEachern, Captain Cicio, and Officer Blackshear—who had recently arrived at the scene—forced Mr. Cash's arms behind his back. Officer McEachern repeatedly employed a technique called an "elbow strike" against Mr. Cash's upper body, including his head. Two other officers arrived and tackled Mr. Cash around the legs. Mr. Cash was eventually subdued, handcuffed, and put into the back of Officer McEachern's police cruiser. Over the course of the scuffle, Mr. Cash was hit "several" times. ROA, Vol. II at 148.

Officer McEachern then retrieved a Beretta .22 LR pistol from underneath the

-7-

gym bag in the backseat of Mr. Cash's vehicle.  The pistol's chamber was loaded, the hammer was cocked, the safety was off, and the magazine had six rounds in it.  After Officer McEachern rendered the firearm safe, the officers conducted an inventory of Mr. Cash's vehicle.  They found 10 grams of methamphetamine in the front seat, divided unequally into 11 baggies inside a camera bag; three Xanax pills; half of a Lortab pill; and used syringes.

Meanwhile, Officer Blackshear informed Officer Brittingham that Mr. Cash—then handcuffed in the back of Officer McEachern's police cruiser—wanted to speak with him.  Officer Brittingham approached the open passenger side window of the cruiser and asked Mr. Cash "what was going on[?]"  ROA, Vol. II at 137.  According to Officer Brittingham, Mr. Cash responded, "[y]ou've got to help me.  They're going to kill me." *Id.*  Officer Brittingham then asked, "[w]hat's the deal?" *Id.*  He testified that Mr. Cash replied, "I've been dealing drugs, I've been messing with some really bad people, they're going to kill me, you've got to help me, you've got to get me out of here." *Id.* at 138. Mr. Cash was not *Mirandized* before this conversation.

Officer Brittingham testified that, during this conversation, Mr. Cash was not as agitated as earlier and seemed more serious and sincere, but that he was sweating profusely, perhaps from the exertion of the fight.  He also testified that he did not see any injuries on Mr. Cash, and although he did not ask Mr. Cash if he needed medical assistance, Mr. Cash did not request any assistance either.

At the suppression hearing, Mr. Cash testified that he did not remember making

these statements. In particular, he testified that someone hit him in the head during the fight and he could not remember anything that happened between the time of the altercation outside his vehicle and when he reached the booking area of the county jail.

Jessica Edwards, a confinement officer at the county jail, testified that she was surprised when Mr. Cash came in and did not recognize her because they had previously met each other.[3] She stated that Mr. Cash was "very confused" and told her that he had a headache and that the lights were too bright. *Id.* at 163. Officer Edwards also testified that Mr. Cash had a cut by his left eye, which was almost swollen shut, and significant bruising on the left side of his head. She thought that Mr. Cash might have suffered a concussion because her children had displayed similar symptoms when they had suffered concussions in the past. Accordingly, Officer Edwards notified her sergeant of Mr. Cash's possible need for medical treatment. He told her that the nurse would see Mr. Cash when she had time. After work, she called Mr. Cash's father to inform him that his son was in jail, and she also told him about the injuries she had observed. Mr. Cash neither complained to his father about nor sought medical treatment for his injuries.

B. *Procedural History*

On August 9, 2011, a federal grand jury indicted Mr. Cash on three counts: possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count One); possession of a firearm in furtherance of a

---

[3] The two had spent a total of four or five hours together at a mutual friend's house "a couple of times." ROA, Vol. II at 161.

drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (Count Two); and as a felon in possession of firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) (Count Three).

1. **Motion to Suppress Seized Evidence**

Mr. Cash moved to suppress the firearm and the drugs found during the traffic stop as fruit of an illegal detention. The magistrate judge conducted an evidentiary hearing at which Officers McEachern and Brittingham testified. On November 14, 2011, the magistrate judge entered Findings and Recommendation advising the district court to deny Mr. Cash's motion. In particular, the magistrate judge recommended upholding both (1) the initial stop; and (2) the prolonged detention of Mr. Cash.

First, the stop itself was deemed constitutional because Officer McEachern "observed the violation of a traffic ordinance"—failing to come to a complete stop at a stop sign. ROA, Vol. I at 71 (citing *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)).

Second, the magistrate judge held that Officer McEachern's decision to detain Mr. Cash for 25 minutes was not unreasonable. Specific and articulable facts, including the bladder device and Mr. Cash's own admissions that he was on his way to take a drug test for his federal probation officer, raised Officer McEachern's suspicion that Mr. Cash was on his way to defeat a urine drug test—a possible violation of Oklahoma law and his supervised release. *See* ROA, Vol. I at 51, 73; Okla. Stat. tit. 63, § 7002(A)(2). Further, "[a]dditional factors such as the noticeable nervousness, jittery movement, and

-10-

talkativeness only served to increase [Officer] McEachern's suspicion and justification for continued detention." ROA, Vol. I at 73-74. He was therefore justified in extending the encounter to confirm certain facts with Officer Brittingham—Mr. Cash's probation officer. Accordingly, because no Fourth Amendment violation occurred, the magistrate judge recommended denying Mr. Cash's motion to suppress.

On January 3, 2012, the district court entered an order adopting the magistrate judge's Findings and Recommendation in full. Although the district court expressed frustration with the dysfunction of the patrol cruiser's video and audio system, it nonetheless was "persuaded that the present record present[ed] sufficient clarity" for the court to "rule with confidence." ROA, Vol. I at 106. The court was troubled by Officer McEachern's failure to retrieve the bladder device when he first saw it in plain view and his testimony that he would have let Mr. Cash go if Officer Brittingham had not arrived. But the court nevertheless concluded that Officer McEachern "*could* have arrested [Mr. Cash] and seized the item, without waiting" for Officer Brittingham. *Id.* Because Officer McEachern had an independent basis and reasonable suspicion for the detention, this case did not involve the search of "a parolee *qua* parolee." *Id.* (citing *United States v. Freeman*, 479 F.3d 743, 748-49 (10th Cir. 2007)). Accordingly, the district court held that the stop and detention were reasonable.

2. **Motion to Suppress Statements**

On February 1, 2012, five days before trial was scheduled to begin, the Government informed Mr. Cash that it intended to offer Officer Brittingham's testimony

about Mr. Cash's incriminating statements in the cruiser. Mr. Cash moved to suppress his statements, arguing that they were (1) taken in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and (2) made involuntarily because he was under the influence of narcotics, had suffered a traumatic beating, and was "hog-tied" when the conversation took place. ROA, Vol. I at 137.

On February 6, 2012, the district court held a hearing to address these arguments; Officer Brittingham, Officer Edwards, Mr. Cash's father, and Mr. Cash testified. At the end of the hearing, after a one hour recess, the district court denied the motion to suppress in an oral order on the record. After discussing the legal standards governing confessions and considering "the briefs, the testimony presented by both parties, and the argument of counsel," the court denied Mr. Cash's motion without further analysis. ROA, Vol. II at 278.

3. **Trial and Sentencing**

On February 7, 2012, the parties tried the case before a jury. Three days later, the jury found Mr. Cash guilty on all three counts. The district court entered judgment on October 11, 2012, sentencing Mr. Cash to 240 months imprisonment on Count One, 60 months on Count Two, and 360 months on Count Three.[4] The district court also ordered Mr. Cash to pay $300 in penalties. Finally, the court sentenced Mr. Cash to three years

---

[4] The court further specified that the term of imprisonment on Counts One and Three must be served concurrently, and the term of imprisonment on Count Two must be served consecutively to the terms imposed on Counts One and Three.

of supervised release on Counts One and Three, and five years of supervised release on Count Two, to be served concurrently.

Mr. Cash now appeals.[5] Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## II. **DISCUSSION**

Mr. Cash argues that the district court should have suppressed (A) the drug and weapon evidence because it was retrieved from his car in violation of the Fourth Amendment; and (B) his statements to Officer Brittingham because they were obtained in violation of the Fifth Amendment. We address these issues in turn.

### A. *Motion to Suppress the Drugs and Firearm*

### 1. **Standard of review**

When reviewing a district court's denial of a motion to suppress seized evidence, we consider "the totality of the circumstances and view[] the evidence in the light most

---

[5] On October 29, 2012, the district court considered whether to hold a revocation of supervised release hearing. Mr. Cash waived his right to an evidentiary hearing and admitted to the offenses in the Government's report. On October 31, the district court entered judgment and commitment, sentencing Mr. Cash to 60 months imprisonment, to be served consecutively with his other sentence. Mr. Cash appealed this order, *see* Case No. 12-7079, and we consolidated the appeals on February 5, 2013. However, both Mr. Cash and the Government agree that there is no merit to the appeal in Case No. 12-7079. *See* Aplt. Br. at 40-41; Aplee. Br. at 39-40. We agree, and therefore dismiss it. *See* 18 U.S.C. § 3583(e); U.S.S.G. § 7B1.3(f); *see also United States v. Rodriguez-Quintanilla*, 442 F.3d 1254, 1256, 1258 (10th Cir. 2006) (district court neither abused its discretion nor imposed an unreasonable sentence by imposing fifteen month consecutive sentence where defendant admitted violating terms of his supervised release by illegally reentering the country).

favorable to the government.  The district court's factual findings are reviewed for clear error."  *United States v. Madden*, 682 F.3d 920, 924 (10th Cir. 2012) (citations omitted).  "The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court."  *United States v. Kimoana*, 383 F.3d 1215, 1220 (10th Cir. 2004).  "A district court's factual finding is clearly erroneous when it is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made."  *United States v. Tafoya*, 557 F.3d 1121, 1126 (10th Cir. 2009) (quotations omitted).

"The ultimate determination of reasonableness under the Fourth Amendment, however, is a question of law reviewed de novo."  *Madden*, 682 F.3d at 924-25.

2.  **Applicable law**

The Fourth Amendment protects "persons, houses, papers, and effects[] against unreasonable searches and seizures."  U.S. Const. amend. IV.  "A traffic stop is a 'seizure' within the meaning of the Fourth Amendment," and we "analyze such stops under the principles developed for investigative detentions in *Terry v. Ohio*, 392 U.S. 1 (1968)."  *United States v. Trestyn*, 646 F.3d 732, 741-42 (10th Cir. 2011) (citations omitted); *see also Delaware v. Prouse*, 440 U.S. 648, 653-55 (1979).

When evaluating the reasonableness of a traffic stop, we ask "first whether the officer's action was justified at its inception, then second whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

-14-

*Trestyn*, 646 F.3d at 742 (quotations omitted). "Under our cases, [the initial] traffic stop is valid under the Fourth Amendment if it is based on an observed traffic violation." *Swanson v. Town of Mountain View, Colo.*, 577 F.3d 1196, 1201 (10th Cir. 2009) (quotations omitted); *see also United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc).

As to the second inquiry, a traffic stop generally "must last no longer than is necessary to effectuate the purpose of the stop." *United States v. Pena-Montes*, 589 F.3d 1048, 1052 (10th Cir. 2009) (quotations omitted); *see also Illinois v. Caballes*, 543 U.S. 405, 407 (2005). A law enforcement officer conducting a routine traffic stop "may generally request a driver's license, registration, and other required papers, run requisite computer checks, and issue citations or warnings as appropriate." *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004); *see also United States v. Cervine*, 347 F.3d 865, 871 (10th Cir. 2003) (stating that an officer may also inquire about travel plans). But an officer may not prolong the detention unless (1) he or she "develops an objectively reasonable and articulable suspicion that the driver is engaged in some illegal activity, or (2) the initial detention becomes a consensual encounter." *Rosborough*, 366 F.3d at 1148 (quotations omitted).

Reasonable suspicion is an objective standard that inquires, based on the totality of circumstances, "whether the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate." *United States v. McGehee*, 672 F.3d 860, 867 (10th Cir. 2012) (quotations and citations omitted).

"[D]eference is to be accorded a law enforcement officer's ability to distinguish between innocent and suspicious actions." *Id.* (quotations omitted). Although "the level of suspicion required is considerably less than proof by a preponderance of evidence or that required for probable cause," it must be based on "something more than an inchoate and unparticularized suspicion or hunch." *United States v. Chavez*, 660 F.3d 1215, 1221 (10th Cir. 2011) (quotations omitted). The "government bears the burden of proving the reasonableness of [an] officer's suspicion." *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010).

3. **Analysis**

Mr. Cash argues that even if the initial stop were legal,[6] its *duration* was not, and therefore any physical evidence seized by the police is inadmissible. We disagree. Although the magistrate judge correctly found that Mr. Cash did not consent to a longer encounter (*see* ROA, Vol. I at 72), an officer may nonetheless extend a detention when he

---

[6] It is not clear whether Mr. Cash challenges on appeal the legality of his initial stop, but because he has not clearly waived this issue, we will address it briefly. Officer McEachern witnessed Mr. Cash's vehicle fail to come to a complete stop at a stop sign— a traffic violation under local law. *See* Okla. Stat. tit. 47, § 11-403(B). This provided a sufficient objective justification to pull over Mr. Cash and issue him a traffic citation. *See United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001) ("A traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation." (quotations omitted)). This conclusion remains even if Officer McEachern's subjective motivation for the stop may have been based on knowledge that Mr. Cash's vehicle was recently spotted outside a known drug house. *See Whren v. United States*, 517 U.S. 806, 813 (1996) (subjective motivations of officers are irrelevant for evaluating "constitutional reasonableness of traffic stops" under the Fourth Amendment); *Botero-Ospina*, 71 F.3d at 787 (same). The initial stop itself was therefore constitutional.

-16-

or she observes specific and articulable facts supporting a reasonable suspicion that the driver is engaged in illegal activity. *See United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004).

Here, Officer McEachern observed sufficient articulable facts to justify continuing the detention. First, at the very outset of the stop, he observed the bladder device in plain view on the passenger seat in Mr. Cash's vehicle. Officer McEachern testified that he immediately associated it with being used to cheat a drug test. Second, Mr. Cash told Officer McEachern at the beginning of the stop that he was on his way to a drug test with Officer Brittingham, whom Officer McEachern knew to be a federal probation officer. Officer McEachern therefore knew that Mr. Cash was either on federal probation or supervised release. Taken together, these facts led Officer McEachern to reasonably believe that Mr. Cash was on his way to "[a]ttempt to foil or defeat a urine, drug, or alcohol screening test," Okla. Stat. tit. 63, § 7002(A)(2)—conduct that Officer McEachern knew to violate Oklahoma state law.

Mr. Cash argues that possessing a bladder device without urine is akin to possessing an empty holster and thus was not a "substantial step" required to constitute the crime of attempt. *See* Aplt. Br. at 30-31. But Officer McEachern was not required to conclude a crime had been committed. He needed only reasonable suspicion. The bladder device and Mr. Cash's own admission that he was on his way to take a drug test

-17-

provided sufficient reasonable suspicion that he was on his way to defeat that drug test.[7]

*See United States v. Chavez*, 660 F.3d 1215, 1221 (10th Cir. 2011) ("[T]he level of suspicion required is considerably less than proof by a preponderance of the evidence or that required for probable cause." (quotations omitted)).

Mr. Cash's inconsistent statements and nervousness—although far from dispositive themselves[8]—contributed to the totality of circumstances. At the beginning of the stop, Mr. Cash told Officer McEachern that he was late for a drug test at Officer Brittingham's office. Several minutes later, Mr. Cash said that he was late for a drug test at the Kiamichi Counseling Center. These statements gave rise to a reasonable inference

---

[7] Although we agree that the eye drop bottle filled with yellow liquid cannot factor into the reasonable suspicion analysis because it was not seen until after Officer McEachern extended the detention, this does not alter our conclusion that the other information available to Officer McEachern provided reasonable suspicion to detain Mr. Cash.

[8] Contrary to Mr. Cash's assertions, *see* Aplt. Br. at 25-27, neither of these factors was the primary basis for the magistrate judge's conclusion that the prolonged detention was lawful. First, although the magistrate judge listed Mr. Cash's inconsistent statements as one of the reasons given by Officer McEachern to justify prolonging the detention, she did not rest her legal conclusion on that factor. *See* ROA, Vol. I at 72, 74. Second, the magistrate judge observed that Mr. Cash's nervousness merely "served to increase [Officer] McEachern's suspicion and justification for continued detention" after the bladder device had already provided Officer McEachern with "the requisite reasonable, articulable suspicion of criminal activity." ROA, Vol. I at 73-74.

of inconsistency, and in turn, evasiveness.[9]  *See United States v. Kitchell*, 653 F.3d 1206, 1219 (10th Cir. 2011) (observing that a motorist's "inconsistent statements in response" to questions about the motorist's travel plans "can give rise to reasonable suspicion of criminal activity").

Additionally, Officer McEachern testified that Mr. Cash was visibly nervous, and Officer Brittingham—who was familiar with Mr. Cash—confirmed this observation in his testimony.  *See* ROA, Vol. II at 93 (stating that Mr. Cash appeared "clearly agitated" and was "sweating profusely, which is not normal"); *see also id.* at 145-46.  Although we have recognized that nervousness is "a common and natural reaction to an interaction with a police officer, whether one is innocent or guilty," *Kitchell*, 653 F.3d at 1220 (citing *Simpson*, 609 F.3d at 1147), it can nevertheless "contribute marginally to a reasonable suspicion of illegal activity," *United States v. Davis*, 636 F.3d 1281, 1291 (10th Cir. 2011), when it is "unusually severe or persistent," *Kitchell*, 653 F.3d at 1220 (quotations omitted).

Where, as here, circumstances during a routine traffic stop give rise to reasonable suspicion that a driver is involved in illegal activity before law enforcement officers have finished the citation process, we have upheld detentions that stretch well beyond the time required to run a license check and write a citation.  *See, e.g.*, *Kitchell*, 653 F.3d at 1218-

---

[9] Later testimony revealed that the probation office contracted with Kiamichi for their drug tests (ROA, Vol. II at 96), but Officer McEachern reasonably believed Mr. Cash had stated two distinct destinations.  *See* ROA, Vol. II at 37-38.

21 (21 minutes and 45 seconds not unreasonable where inconsistent travel plans, nervousness, and use of a rental car gave rise to reasonable suspicion of criminal activity); *United States v. Villa-Chaparro*, 115 F.3d 797, 802-03 (10th Cir. 1997) (38 minutes to await arrival of canine unit not unreasonable where defendant failed to pull over promptly or provide proof that he could lawfully operate the vehicle, and the officer observed soap crystals—a common masking agent—on the floorboard); *United States v. Cervine*, 347 F.3d 865, 872-74 (10th Cir. 2003) (50 minutes); *see also United States v. Sharpe*, 470 U.S. 675, 685 (1985) ("[O]ur cases impose no rigid time limitation on *Terry* stops.").

In this case, after observing facts giving rise to reasonable suspicion that Mr. Cash was on his way to defeat a drug test, Officer McEachern requested—at 5 minutes, 47 seconds into the video—Officer Brittingham's presence at the scene. Officer Brittingham arrived roughly 13 minutes later. Although the record indicates that Officer Brittingham's office was only five to six blocks from where Mr. Cash was stopped (ROA, Vol. II at 86), his delay was not unreasonable. *See United States v. Patterson*, 472 F.3d 767, 776 (10th Cir. 2006) (courts "need not make a time and motion study of traffic stops; we consider the detention as a whole and the touchstone of our inquiry is reasonableness"), *vacated on other grounds*, 555 U.S. 1131 (2009). As the Government explains, "he was the only person in the office at the time" and "had to shutdown the computers, lock up and set the alarm, which took 10 to 15 minutes." Aplee. Br. at 10 n.4; *see also* ROA, Vol. II at 86.

Accordingly, we hold that the prolonged detention of Mr. Cash was not unreasonable and affirm the district court's denial of Mr. Cash's motion to suppress the physical evidence retrieved from his car.

### B. *Motion to Suppress Mr. Cash's Statements to Officer Brittingham*

Mr. Cash also appeals the district court's denial of his motion to suppress his incriminating statements to Officer Brittingham about "dealing drugs," ROA, Vol. II at 138. He argues that his confession was (1) obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966); and (2) involuntary. *See* Aplt. Br. at 35-39, 41. We address these issues in turn.

### 1. **Mr. Cash's entitlement to a *Miranda* warning**

#### a. *Standard of review*

As with Fourth Amendment motions to suppress evidence, when reviewing the district court's order denying a motion to suppress statements under the Fifth Amendment, we accept the district court's factual findings unless clearly erroneous and view the evidence in the light most favorable to the Government. *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008). In doing so, "[w]e are permitted to consider the evidence introduced at the suppression hearing, as well as any evidence properly presented at trial." *Id.* (quoting *United States v. Harris*, 313 F.3d 1228, 1233 (10th Cir. 2002)). We review the "ultimate question of whether *Miranda* applies, however," de novo. *Id.* (citing *United States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000)).

-21-

b. *Applicable law*

The Fifth Amendment provides, in part, that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." *Id.* at 478. Thus, "any confession obtained during a 'custodial interrogation' may not be used by the prosecution against the defendant unless the prosecution demonstrates the use of procedural safeguards effective to secure the Fifth Amendment privilege against self-incrimination." *United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008) (citing *Miranda*, 384 U.S. at 444).

For *Miranda*'s protections to apply, "custodial interrogation must be imminent or presently occurring." *United States v. Rambo*, 365 F.3d 906, 909 (10th Cir. 2004). *Miranda* is therefore only applicable when (1) the suspect is in "custody," and (2) any "questioning [] meet[s] the legal definition of interrogation." *United States v. Benard*, 680 F.3d 1206, 1211 (10th Cir. 2012) (quotations omitted). To be in custody, a person must be under formal arrest or have "his freedom of action . . . curtailed to a degree associated with formal arrest." *Id*. (quotations omitted).

"The fact that [a defendant is] in custody," however, "does not automatically render [an] exchange an interrogation." *Fox v. Ward*, 200 F.3d 1286, 1298 (10th Cir. 2000). Rather, "interrogation" refers to "either express questioning or its functional

-22-

equivalent"—i.e., "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).

The Supreme Court has not since elaborated on the meaning of "express questioning," and the Tenth Circuit has refused to read the term literally. Rather, we have determined that "interrogation extends *only* to words or actions that the officers should have known were reasonably likely to elicit an incriminating response." *Fox*, 200 F.3d at 1298 (emphasis added); *see also United States v. Roman-Zarate*, 115 F.3d 778, 782 (10th Cir. 1997). Other circuits have adopted similar positions. *See, e.g.*, *United States v. Allen*, 13 F.3d 105, 109-10 (4th Cir. 1993); *United States v. Briggs*, 273 F.3d 737, 740-41 (7th Cir. 2001); *United States v. Fleck*, 413 F.3d 883, 892-93 (8th Cir. 2005); *United States v. Gonzalez-Mares*, 752 F.2d 1485, 1489 (9th Cir. 1985).

This approach is consistent with both *Miranda* and *Innis*, which stated that "[i]nterrogation . . . must reflect a measure of compulsion above and beyond that inherent in custody itself." *Innis*, 446 U.S. at 300; *see also* W. LaFave et al., 2 Crim. Proc. § 6.7(b) (3d ed.) ("The underlying rationale of *Innis* is that *Miranda* covers only police conduct likely to be coercive when coupled with defendant's custody, which cannot be said of a question that does nothing more than seek clarification of what the defendant has already volunteered."). Not every sentence punctuated by a question mark constitutes an interrogation. "Express questioning" cannot sweep so broadly. Asking "how's it

-23-

going?" is a far cry from "where were you on the night of the murder?" Indeed, "a definition of interrogation that included any question posed by a police officer would be broader than that required to implement the policy of *Miranda* itself." *United States v. Foster*, 227 F.3d 1096, 1102-03 (9th Cir. 2000) (quotations omitted).

Thus, although asking a question is relevant to determining whether an interrogation has occurred, it is neither sufficient nor necessary. Instead, we must inquire whether law enforcement officials should have known that their words or actions— whether framed as a question or not—were reasonably likely to elicit an incriminating statement. *See Fox*, 200 F.3d at 1298; *see also Briggs*, 273 F.3d at 741 ("Only questions that are 'reasonably likely to elicit an incriminating response from the suspect' are improper." (quoting *Innis*, 446 U.S. at 301-02)). This inquiry is "an objective one," and we focus on the "perceptions of a reasonable person in the suspect's position rather than the intent of the investigating officer." *United States v. Rambo*, 365 F.3d at 909 (citation omitted).

c. *Analysis*

Mr. Cash argues that his unwarned statements in response to Officer Brittingham's questions should be inadmissible under *Miranda*. We disagree. Although the Government concedes that Mr. Cash was in custody when he was subdued in the back of the police cruiser (Aplee. Br. at 35), the conversation between Mr. Cash and Officer Brittingham did not meet the legal definition of interrogation.

-24-

i. First exchange

First, their initial exchange did not constitute interrogation. Mr. Cash began the conversation when he beckoned Officer Brittingham to the squad car. By its plain terms, *Miranda* only applies to "questioning *initiated by law enforcement officers* after a person has been taken into custody." *Miranda*, 384 U.S. at 444 (emphasis added); *see also United States v. Roman-Zarate*, 115 F.3d 778, 782 (10th Cir. 1997) ("The agents did not interrogate [the defendant. The defendant] initiated communication with Agent Bakios who simply responded to his questions."); *United States v. Withorn*, 204 F.3d 790, 796 (8th Cir. 2000) (no interrogation where defendant in custody "initiated the [incriminating] conversation" with his federal probation officer and presented no evidence of police manipulation).

In response to Mr. Cash's request to see him, Officer Brittingham asked "what was going on[?]" (ROA, Vol. II at 137). Although phrased as a question, this was merely an innocuous attempt to understand why Mr. Cash wanted to speak with him. *See United States v. Jones*, 600 F.3d 847, 854 (7th Cir. 2010) (no interrogation where defendant in custody requested to speak to detective and detective "asked [the defendant] why he wanted to see him, but asked no leading questions of any sort"); *see also* W. LaFave et al., 2 Crim. Proc. § 6.7(b) (3d ed.) (exclusion of "innocuous question[s]" from the definition of interrogation is "certainly correct" given the *Innis* Court's admonition that "'police surely cannot be held accountable for the unforeseeable results of their words or actions.'" (quoting *Innis*, 446 U.S. at 301-02)). It was not "reasonably likely to elicit an

incriminating response," *Innis*, 446 U.S. at 301.  Mr. Cash's answer—"You've got to

help me.  They're going to kill me." (ROA, Vol. II at 137)—was therefore not the

product of interrogation, and *Miranda* does not forbid its admission against Mr. Cash.

ii. Second exchange

Second, Officer Brittingham's follow up question—"[w]hat's the deal?" (*id.*)—did

not elevate the brief encounter into an interrogation.  Rather, this question was simply an

attempt to clarify Mr. Cash's dramatic statement about threats to kill him so that Officer

Brittingham could assist his supervisee.  Although he phrased it as a question, Officer

Brittingham was following up in response to Mr. Cash's spontaneous statement and was

not engaged in interrogation.  *See Andersen v. Thieret*, 903 F.2d 526, 532 (7th Cir. 1990)

(no interrogation where unwarned defendant voluntarily stated "I stabbed her," police

responded "Who?," and defendant gave an incriminating name); *United States v. Rhodes*,

779 F.2d 1019, 1032 (4th Cir. 1985) (no interrogation where unwarned drug dealer saw

police officers confiscating his notebook and said, "You can't take that," to which a

police officer responded, "Why" and drug dealer stated, "I can't run my business without

that"); *see also* W. LaFave & J. Israel, 2 Crim. Proc. § 6.7(d) & n.153 (3d ed.) (follow-up

questions are not interrogation when they are only neutral efforts to clarify).

Moreover, Officer Brittingham's follow up question was not "reasonably likely to

elicit an incriminating response," *Innis*, 446 U.S. at 301.  Officer Brittingham was Mr.

Cash's probation officer and was merely responding to an abstract statement about people

wanting to harm him.  Indeed, the most reasonable and probable understanding of Mr.

-26-

Cash's statement about people trying to kill him was that he was referring to his immediately preceding altercation with police officers. Although an incriminating response to "[w]hat's the deal?" was possible, the question was not so likely to produce an incriminating response that *Miranda* warnings were required. The interaction unfolded quickly and spontaneously at Mr. Cash's behest, and we cannot say that Officer Brittingham "should have known" that his follow up question would have elicited an incriminating response. *See id.* at 302; *cf. United States v. Scalf*, 725 F.2d 1272, 1275-76 (10th Cir. 1984) ("on-the-scene" inquiry to find out what happened after alleged prison assault is not interrogation). Thus, *Miranda* does not prohibit the admission of Mr. Cash's second statement about dealing drugs.

\* \* \* \*

We hold that neither of Mr. Cash's statements to Officer Brittingham occurred during interrogation.[10] Accordingly, *Miranda* does not render them inadmissible, and the district court properly denied Mr. Cash's motion to suppress on this ground.

2. **Voluntariness**

Although we conclude Mr. Cash's *Miranda* rights were not violated, our inquiry is not over because Mr. Cash also claims his statements were made involuntarily. He

---

[10] Because of this conclusion, we need not address Mr. Cash's argument that he did not voluntarily waive his *Miranda* rights, *see* Aplt. Br. at 36; *see also Innis*, 446 U.S. at 298 n.2. An inquiry into waiver is only appropriate if a suspect has actually been given *Miranda* warnings. Consequently, Mr. Cash's argument about waiver is better understood as a voluntariness argument, which we address below.

contends that the injuries sustained from his altercation with the arresting officers prevented him from making a voluntary statement during his later conversation with Officer Brittingham.

a. *Standard of review*

We review de novo "the ultimate issue of whether a statement was voluntary, taking into account the totality of the circumstances surrounding the confession." *United States v. Lopez*, 437 F.3d 1059, 1062 (10th Cir. 2006) (quotations omitted). In conducting this review, we "must examine the entire record and make an independent determination of the issue of voluntariness." *Id.* at 1062 (quotations omitted); *see also Davis v. North Carolina*, 384 U.S. 737, 741-42 (1966). But we must accept, unless they are clearly erroneous, the district court's rulings on "subsidiary factual questions, such as whether the police intimidated or threatened a suspect or whether the suspect was particularly susceptible to police coercion." *United States v. Chalan*, 812 F.2d 1302, 1308-09 (10th Cir. 1987).

b. *Applicable law*

Before *Miranda*, the Supreme Court had "recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the

-28-

Fourteenth Amendment." *Dickerson v. United States*, 530 U.S. 428, 433 (2000).[11]

Although "*Miranda* changed the focus of much of the inquiry in determining the admissibility of suspects' incriminating statements," the Supreme Court "never abandoned [the] due process jurisprudence, and thus continue[s] to exclude confessions . . . obtained involuntarily." *Id.* at 434. Nor has it departed from its pre-*Miranda* holding in *Malloy v. Hogan*, 378 U.S. 1 (1964), that the privilege against self-incrimination forbids the introduction of coerced confessions. *See Arizona v. Fulminante*, 499 U.S. 279, 285 (1991) (citing Arizona Supreme Court's reliance on *Malloy*—among other decisions—as "accurately describ[ing] the State's burden of proof for establishing voluntariness"). Thus, even if a defendant is not subject to custodial interrogation—and therefore not entitled to *Miranda* warnings—his incriminating statements, if involuntarily produced, are inadmissible. *See, e.g.*, *id.* at 287-88.

Like the Supreme Court, the Tenth Circuit has evaluated involuntary confessions through the lenses of both the privilege against self-incrimination and the Due Process Clause. *Compare United States v. Toles*, 297 F.3d 959, 965 (10th Cir. 2002) ("When the government obtains incriminating statements through acts, threats, or promises which cause the defendant's will to be overborne, it violates the defendant's Fifth Amendment

_____

[11] In *Malloy v. Hogan*, 378 U.S. 1 (1964), for example, the Court held that the Fifth Amendment privilege against self-incrimination prohibits the states from using coerced confessions in criminal trials. *Id.* at 6. Relatedly, in *Haynes v. Washington*, 373 U.S. 503 (1963), the Court held that the Due Process Clause of the Fourteenth Amendment forbids the use of involuntary confessions at trial. *Id.* at 513-14.

rights and the statements are inadmissible at trial as evidence of guilt." (citing *Malloy*,

378 U.S. at 7)), *and United States v. Short*, 947 F.2d 1445, 1449 (10th Cir. 1991) (same),

*with Chalan*, 812 F.2d at 1307 (observing that use of a confession that is not "the product

of an essentially free and unconstrained choice by its maker . . . offends *due process*"

(quotations omitted) (emphasis added)), *and Lopez*, 437 F.3d at 1063 (same), *and United

States v. Perdue*, 8 F.3d 1455, 1466 (10th Cir. 1993) (same).

Mr. Cash's brief does not clearly convey whether he challenges the voluntariness

of his confession under the privilege against self-incrimination or the Due Process

Clause.[12] Our inquiry is the same under either theory. The voluntariness of a statement

"depends upon an assessment of 'the totality of all the surrounding circumstances'

including 'both the characteristics of the accused and the details of the interrogation.'"

---

[12] At first glance, Mr. Cash appears to confuse the issue of waiver under *Miranda* with that of involuntary confessions in violation of the privilege against self-incrimination and/or the Due Process Clause. As we discuss above, whether a suspect has "voluntarily, knowingly, and intelligently" waived his *Miranda* rights, *see Colorado v. Spring*, 479 U.S. 564, 577 (1987), is only relevant when an accused has received *Miranda* warnings. *See supra* note 10. But even when a confession is not obtained in violation of *Miranda*, it must nonetheless be voluntary to be admissible. And regardless of whether we evaluate the voluntariness of a statement through the lens of *Miranda* waiver, the privilege against self-incrimination, or the Due Process Clause, our inquiry is the same—we consider the totality of the circumstances. *See Colorado v. Connelly*, 479 U.S. 157, 169-70 (1986) ("There is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context."); *Dickerson v. United States*, 530 U.S. 428, 434 (due process test considers "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation" (quotations omitted)).

*Chalan*, 812 F.2d at 1307 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

In applying a totality of circumstances analysis, we have considered "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to any physical punishment." *Lopez*, 437 F.3d at 1063-64 (quotations omitted); *see also Schneckloth*, 412 U.S. at 226; *Chalan*, 812 F.2d at 1307.

The Supreme Court in *Colorado v. Connelly*, 479 U.S. 157 (1986), "clarified and refined" this test. *United States v. Erving L.*, 147 F.3d 1240, 1249 (10th Cir. 1998). The *Connelly* Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Connelly*, 479 U.S. at 167. The Due Process Clause is not implicated without the "crucial element of police overreaching." *Id.* at 163. "Accordingly, it is clear after *Connelly* that a confession is only involuntary . . . if the police use coercive activity to undermine the suspect's ability to exercise his free will." *Erving L.*, 147 F.3d at 1249. But "[e]ven where there is causal connection between police misconduct and a defendant's confession, it does not automatically follow that there has been a violation of the Due Process Clause." *Connelly*, 479 U.S. at 164 n.2.

c. *Analysis*

We conclude that Mr. Cash's statements to Officer Brittingham were voluntary. Although Mr. Cash had recently been hurt while resisting arrest, there is no evidence that

-31-

the police coerced him into making any of his statements—a necessary predicate for an involuntary confession claim.

Mr. Cash relies on *United States v. Morris*, 287 F.3d 985 (10th Cir. 2002), a *Miranda* waiver case, to support his argument that one's "voluntariness could be affected by a severe injury." Aplt. Br. at 39. We do not dispute that statement of the law. Nor do we disagree with Mr. Cash that *Morris*'s voluntariness analysis is relevant to this case even though *Morris* is a *Miranda* waiver case. *See Connelly*, 479 U.S. at 169-70 ("There is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the [Due Process Clause] confession context."). But *Morris* supports the lack of coercion in the present case.

In *Morris*, an undercover FBI agent shot the defendant twice in the back while he attempted to flee arrest. 287 F.3d at 987, 989. Because of the injuries, the defendant spent a week in the intensive care unit ("ICU"). *See id.* After the defendant got out of the ICU, but while he was still hospitalized and on pain medication, FBI agents secured a *Miranda* waiver and elicited incriminating statements from him. *See id.* We held that the defendant's *Miranda* waiver was voluntary because the evidence "overwhelmingly show[ed] a lack of any government coercion, either intentional or unintentional." *Id.* at 989. In particular, there was "no evidence of FBI misconduct," and the FBI exercised "great caution" by waiting ten days to speak with the defendant. *Id.*

Although the interaction between Mr. Cash and Officer Brittingham, unlike the interview in *Morris*, occurred shortly after Mr. Cash's tussle with the arresting officers

-32-

while resisting arrest, there was no evidence of police misconduct here. Mr. Cash did not get out of his vehicle when ordered to do so after the officers saw a firearm in the backseat. Even after Officer McEachern removed Mr. Cash from the vehicle, Mr. Cash resisted arrest by refusing to put his arms behind his back. Once the officers subdued and handcuffed Mr. Cash, they placed him in the back of Officer McEachern's cruiser and left him alone until Mr. Cash asked to speak with Officer Brittingham.[13] Officer Brittingham himself threatened no physical coercion during their conversation, and merely responded to Mr. Cash's entreaties. Nor did Officer Brittingham elicit Mr. Cash's statements through manipulation or false promises of leniency. *See Lopez*, 437 F.3d at 1064 ("[A] promise of leniency is relevant to determining whether a confession was involuntary and . . . may render a confession coerced.").

Further, Officer Brittingham testified that Mr. Cash did not appear injured or confused during their conversation. *See United States v. Hack*, 782 F.2d 862, 866 (10th Cir. 1986) (no coercion where agent interviewing defendants at hospital two days after one had sustained gunshot wound in the mouth "observed that both defendants remained mentally alert and were conversant with the details of the hijacking" under investigation); *United States v. Robertson*, 19 F.3d 1318, 1321 (10th Cir. 1994) (no coercion where FBI agent observed that defendant, who had recently awoken from a 31-day coma, "seemed responsive and coherent when he was asked about himself, his relatives and the

---

[13] Although Mr. Cash asserts he was "hog-tied," Aplt. Br. at 13, Officer McEachern testified that no leg restraints were used. *See* ROA, Vol. II at 521, 553.

geographical area" even though defendant mistakenly gave his age as 27 when in fact he was 38 years old). Indeed, Mr. Cash's injuries were not visible until he was taken in for booking. And although Mr. Cash purportedly did not recognize Officer Edwards at the county jail, the two had spent only a total of four to five hours together in a group of several people at a mutual friend's home.[14]

Finally, Mr. Cash's assertion that Officer Brittingham improperly took advantage of him while he was under the influence of narcotics has no merit. Although it was "possible that [Mr. Cash] had illegal drugs in his system," there was "no way that [Officer Brittingham] could say that [Mr. Cash] was actually under the influence to a degree." ROA, Vol. II at 146; *see also Short*, 947 F.2d at 1450 (no coercion where defendant on painkillers for serious injuries conversed "freely and intelligently on several subjects" with questioning officers and "never told his questioners that he felt too ill or groggy to answer questions").

When viewed as a whole, the record does not support that police coercion caused Mr. Cash's confession. This is "not a case where the police beat a confession out of a defendant, but rather a situation where the police were required to use force to subdue a fighting suspect," *United States v. Carroll*, 207 F.3d 465, 472 (8th Cir. 2000) (no coercion where use of force was limited to restraining defendant and subsequent questioning was not backed by a threat of additional force); *see also United States v.*

---

[14] Mr. Cash neither filed an excessive force claim nor sought medical attention for his injuries after his arrest.

*Slater*, 971 F.2d 626, 636-37 (10th Cir. 1992) (confession taken at headquarters upon completion of police chase deemed voluntary even though defendant resisted arrest and some officers "hit or kicked the defendant once he was apprehended" after "physically pulling [him] through his car window").

In sum, we hold that Mr. Cash's statements to Officer Brittingham were voluntary. Although Mr. Cash sustained injuries while resisting arrest, the record does not indicate that police coercion caused him to make incriminating statements. Accordingly, we affirm on this issue.

## III. **CONCLUSION**

For the foregoing reasons, we affirm the district court's denial of Mr. Cash's motions to suppress. Case No. 12-7072. We also dismiss Mr. Cash's appeal from the district court's revocation of his supervised release. Case No. 12-7079.