**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**July 17, 2017**

**FOR THE TENTH CIRCUIT**

———————————————————

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

No. 16-2060

GAVIN YEPA,

     Defendant - Appellant.

———————————————————

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:12-CR-00163-MCA-1)**

———————————————————

Brian A. Pori, Office of the Federal Public Defender, Albuquerque, New Mexico, for Defendant-Appellant.

James R.W. Braun, Assistant United States Attorney, (Damon P. Martinez, United States Attorney, with him on the brief), Las Cruces, New Mexico, for Plaintiff-Appellee.

———————————————————

Before **TYMKOVICH**, Chief Judge, **BALDOCK**, and **HARTZ**, Circuit Judges.

———————————————————

**HARTZ**, Circuit Judge.

———————————————————

     The sole issue on appeal is whether self-incriminating statements by Defendant Gavin Yepa during a search of his person authorized by a warrant were spontaneous or were the result of interrogation. We affirm the district court's ruling that the statements

were spontaneous.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm Defendant's conviction.

## I.     BACKGROUND

Defendant was convicted by a jury in the United States District Court for the District of New Mexico of first-degree felony murder in the perpetration of aggravated sexual abuse in Indian country.  *See* 18 U.S.C. §§ 1153 & 1111.  Evidence at trial showed that near midnight on December 28–29, 2011, Defendant knocked on the door of his neighbor, Clint Sando, and told him that there was a woman at his house who was not breathing.  They ran to the house, where Sando found Lynette Becenti's naked body on the floor, covered in blood.  A later autopsy determined that she was likely killed by a shovel that was forced 15–16 inches into her vagina.

Defendant was arrested at his home and advised of his rights.  He said he wanted a lawyer.  He was then driven to the Jemez Pueblo Police Department about 2:45 a.m.  FBI Special Agent Ben Bourgeois obtained a telephonic warrant to search Defendant's home and his body.  The warrant authorized photographing Defendant, taking his clothes for analysis, taking a blood sample for intoxication, and swabbing areas of his body for DNA testing.

About 4:20 a.m. Bourgeois began executing the search of Defendant's body in a police-department conference room.  He was assisted by the chief of the Jemez Police, Mike Toya; the leader of the FBI's Evidence Response Team (ERT), Diana Parker; and another ERT member, Norm Sedillo.  The search, which took a bit more than 50 minutes, was audio-recorded; the recording was later transcribed.  During the search, Defendant

2

made various statements, some of which were apparently in Towa, the language of the Jemez Pueblo. The record contains no translation of those portions.

To analyze Defendant's claim, we must quote in some detail the transcript of the conversation during the search of his person. The officers' statements alleged by Defendant to constitute interrogation are italicized. We have deleted most expletives from the transcript, but all the expletives were Defendant's; we have reproduced the officers' statements unaltered. The recording shows the time that has elapsed during the search, and we provide that information for the portions we quote. What is striking from the recording is that Defendant's incriminating statements are scattered throughout, without any apparent connection to what is going on at the time, and that the officers are focused on performing their search, rarely reacting in any way to what Defendant says about the offense.

Bourgeois began the search by informing Defendant that he and his team would take some photos of Defendant and would then seize his clothes "because they've got blood on them." Supp. R., Vol. 1 at 3 (Tr.) (CD at 1:28–1:38). Next, Bourgeois introduced Defendant to Diana Parker, stating "Gavin, this is my partner, Diana, she's gonna snap some pictures of you." *Id.* at 5 (CD at 3:37–3:43). He also removed Defendant's handcuffs and instructed him how to stand for the photos. Without any prompting, Defendant stated, "I'm not a killer, man. I'm not a murderer, man. I'm not nothing like that, man. I'm just a normal guy, man. I came home, tried to get some pussy, and pussy got me." *Id.* at 6 (CD at 4:18–4:32). Bourgeois responded: "Okay. Just follow Diana's directions for right now." *Id.* (CD at 4:32–4:35).

As the officers were taking photos, Bourgeois stated, "Hold on.  *Do you have any scars?  Marks?  Anything like that?*  Hold on.  Hold on.  Let's take one thing at a time.  Turn back around."  *Id.* at 7 (CD at 5:36–5:48) (emphasis added).  The next thing Defendant said was, "Don't they have my file here already?"  *Id.* (CD at 6:11–6:25).  He then complained about the cold, but followed that up with, "I can take more clothes off."  *Id.* at 7–8 (CD at 7:00–7:09).  After further photos, Defendant stated, "Be in this predicament.  I don't (inaudible) get in trouble for killing anybody.  I didn't do anything."  *Id.* at 8 (CD at 7:50–8:00).  Parker responded, "Don't worry about it.  It'll work out.  Face the wall."  *See id.* (CD at 8:00–8:03).

Apparently responding to Defendant's comment about the cold, Sedillo then stated, "I'm trying to warm this up," and Bourgeois added, "*He's a tough guy.*"  *Id.* at 8–9 (CD at 8:04–8:10) (emphasis added).  Defendant responded, "Yeah, man.  Well, when it comes to my son (inaudible).  I wanna see my son.  (Inaudible) accuse of me of killing this lady."  *Id.* at 9 (CD at 8:10–8:34).

While the officers continued taking photos, Defendant asked them to notify his mother of his arrest.  After Chief Toya said he would talk to her, Defendant again asserted his innocence, stating, "You know, I'm not a murderer, man.  This happened at my house, dude.  You know, of course I'm trying to get some pussy.  I didn't do shit, man."  *Id.* at 11 (CD at 12:21–12:32).  The officers did not respond to his assertion; but Bourgeois asked for his mother's name and phone number.  Bourgeois then pointed out abrasions on Defendant's body that he wanted documented:

**4**

Bourgeois: Did you guys get this -- it almost looks like an abrasion right here.
Parker: Behind the ears, yeah.
Male Speaker: On the eyebrow there?
Bourgeois: Yeah. Almost.
Male Speaker: Yeah. That side.
Defendant: That's a pimple, man. (Inaudible). I don't know what I did with my face. You guys are trying to figure out some. (Inaudible), man. (Inaudible). I've told you guys. I thought you guys were investigators, man.
Parker: (Inaudible).
Defendant: (Inaudible).
Bourgeois: *You're not a real modest guy, are you?*
Defendant: Nope. No.
Bourgeois: Okay. Tell you what we're gonna do. I'm gonna do you a favor. Norm and I are gonna sit in here --
Defendant: (Inaudible).
Bourgeois: I'm gonna ask Frank to stay here, too.
Defendant: That's what I was thinking, I was like. Is he gay or something?
Bourgeois: Let me have you back up against the wall a little bit more.
Parker: You gotta focus with the very top ring, very top ring. You see it?
Male Speaker: Okay. Let's see.
Defendant: My toes are bloody. My feet are bloody.
Bourgeois: Hold on. Hold on.
Defendant: My face is bloody.

*Id.* at 13–14 (CD at 14:43–16:19) (emphasis added).

After the officers took some more photos and Defendant made some irrelevant comments, he again attempted to engage the officers in conversation about the killing:

Sedillo: Go ahead and leave the toes flattened out.
Defendant: You guys really think I killed that chick or something? Off the top of your head.
Sedillo: Diana should have a pack of swabs and get some of those.
Defendant: What do you think -- you think I killed her? Or what?
Bourgeois: No. We're -- we're just doing all the stuff that we normally would do.
Defendant: What's this procedure for real though? (Inaudible) like somebody killed her? Or what, man? What's really going on, man? I don't even know, man. I'm tripping hard core, man. Like, man.
Bourgeois: Okay. (Inaudible) scale.

**5**

Defendant:  Just died at my house, dude.  And I don't know.
Sedillo:  You can go ahead and stand up.  Thank you.

*Id.* at 17–18 (CD at 22:08–23:20).

As the officers proceeded with their examination, Defendant pointed out some abrasions on his body:

Sedillo:  Okay.  Other knee.  A little abrasion.  Okay.
Defendant:  That one and this one.
Bourgeois:  (Inaudible).
Defendant:  I've got a bunch more on this side and that side.  I've got one right here (inaudible).
Sedillo:  Take a look at the knee over here.
Defendant:  I've got some over here.

*Id.* at 19 (CD at 24:32–24:55).  And he continued to remark on the circumstances of Ms. Becenti's death:

Parker:  We might as well photo the clothes before we put them in the bags, too, huh?
Bourgeois:  Yeah.
Sedillo:  Okay.  Right foot.
Parker:  Right foot.
Defendant:  You guys are investigators, right?
Ms. Parker:  Pardon?
Defendant:  You guys are investigators, right?
Parker:  Uh-huh.
Defendant:  I was really wearing clothes at that time?  Really?  You guys really think that?
Parker:  *What are you talking about?*
Defendant:  I was really wearing clothes?
Sedillo:  Left foot.
Parker:  Two left foot.

*Id.* at 21–22 (CD at 28:57–29:33) (emphasis added).

The photography continued.  When Chief Toya reported to Defendant that he had talked to Defendant's mother, Defendant complained that the victim had died in his

**6**

house.  He said that he was tired and twice said that he wanted to sleep.  He then

requested some water.  That led to the following exchange:

> Sedillo:  I'll get you some water.
> Defendant:  Oh, man, it got sick, dude.  (Inaudible).  (Inaudible) at my house or what?
> Male Speaker:  (Inaudible).
> Defendant:  How come you -- dude.  (Inaudible).
> Male Speaker:  (Inaudible).
> Defendant:  (Inaudible).  By the feed store.  (Inaudible).
> Male Speaker:  (Inaudible).  [Perhaps "*What's that?*"]
> Defendant:  (Inaudible).  That chick.
> Bourgeois:  *With who?*
> Defendant:  She was by herself.  Me -- I was with -- I don't wanna mention no names right now and get anybody in trouble, you know.  But we picked her up over there, and then (inaudible).  (Inaudible), you know, and everything was good.  She had (inaudible).  All that doing herself, man.  Guarantee crazy, man.  We were in that room on this side of my mom's.  I said, my mom's gonna be home, let's go on the other side, man.  I didn't even know she was bleeding like that, man.  Nobody else was there.  We just got dropped off over there at the house.
> Male Speaker:  Dropped off --
> Defendant:  Yeah.  (Inaudible).
> Bourgeois:  *Who were you with?*
> Male Speaker:  They won't get in any trouble for just dropping you off.  *Who were you with?*
> Defendant:  I'm not gonna say anything if I -- I'll probably talk to maybe later, dude.
> Male Speaker:  Okay.
> Defendant:  I'm gonna be in trouble.  (Inaudible).
> Bourgeois:  Maybe you don't wanna sit down, but I wanna sit down.
> Defendant:  I just wanna lay down.  I wanna (inaudible).  Aye, there's no way I would do such a thing, man.  After five months sober (inaudible), I took two shots (inaudible), bro.  Three shots.  And then all of this stupid drama happens.  I've been good, man.  (Inaudible).  I changed for my boy man. Oh man. My son (inaudible).  Thank you, bro.

*Id.* at 29–31 (CD at 44:27–49:20) (emphasis added).  Some portions labeled "inaudible"

in this exchange appear to be statements in Towa by Defendant and "Male Speaker," who

is likely Chief Toya.  The officers concluded the search soon after this exchange.

**7**

Defendant moved to suppress his statements from this recording, arguing that they were the incriminating product of unlawful interrogation. The district court overruled the objection, stating:

> I find that defendant's statements during the execution of the search warrant for the defendant's person were spontaneous and were not the result of interrogation. I further find that his responses to the very few follow-up questions noted, I believe, at Exhibit 195 at Page 29, were simply neutral efforts to clarify his spontaneous volunteered statements, and did not constitute interrogation . . . .
> I also find that they were not obtained in violation of the Fifth Amendment's Due Process Clause. As previously noted, the statements were spontaneous, not the products of questioning by the agents executing the search warrant.
> The audio transcript reveals that the agents executing the warrant were business-like but polite toward defendant at all times. There is absolutely no evidence that I can see here of any implied or explicit threats or coercion or any other form of law enforcement overreaching. The agents were in a position to hear the defendant's statements because they were executing a search warrant for his person, and the requisite course in [coercive?] police activity . . . is totally absent in this case.

R., Vol. 4 at 1136–37.

## II.     ANALYSIS

### A. Governing Law

When an individual who is subjected to custodial police interrogation requests an attorney, "the interrogation must cease until an attorney is present." *Miranda v. Arizona*, 384 U.S. 436, 474 (1966). "[T]he term 'interrogation' . . . refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). We ask whether the officers "should have known that their words

**8**

or actions—whether framed as a question or not—were reasonably likely to elicit an incriminating statement." *United States v. Cash*, 733 F.3d 1264, 1277 (10th Cir. 2013). This is an "objective [inquiry,] . . . and we focus on the perceptions of a reasonable person in the suspect's position rather than the intent of the investigating officer." *Id.* (internal quotation marks omitted). Evidence obtained as a result of a custodial interrogation after an individual requested an attorney must be suppressed. *See Edwards v. Arizona*, 451 U.S. 477, 479–80 (1981). But "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda*, 384 U.S. at 478.

It is essential to recognize that "custody does not automatically render [every] exchange an interrogation." *Fox v. Ward*, 200 F.3d 1286, 1298 (10th Cir. 2000). Although someone in custody may feel psychological pressure to speak arising from the fact of custody alone, we emphasize that "words or actions on the part of the police . . . normally attendant to arrest and custody" are not interrogation. *Innis*, 446 U.S. at 301. Also, "[n]ot every sentence punctuated by a question mark constitutes an interrogation." *Cash*, 733 F.3d at 1277 (follow-up question to clarify remark by defendant was not an interrogation). And "a statement following a police officer's question may qualify as at least the equivalent of being volunteered when it is unresponsive." Wayne R. LaFave, et. al, 2 Crim. Proc. § 6.7(d) (4th ed. 2016 update) (LaFave); *see United States v. Gay*, 774 F.2d 368, 379 (10th Cir. 1985) (evidence admissible when "the incriminating portion of the statement was unresponsive to the [police] request"); *Parson v. United States*, 387 F.2d 944, 946 (10th Cir. 1968) ("The statement to the effect that the car was stolen was

**9**

not responsive to the inquiry about the key and was completely voluntary. *Miranda . . .* does not prohibit such voluntary statements.").

## B. Standard of Review

The district court held that Defendant's statements were spontaneous and that no interrogation occurred. Defendant asks that we review that decision de novo because the facts are undisputed, while the government advocates for clear-error review of the district court's finding that Defendant's statements were spontaneous. There is some merit to each position. "[W]hen reviewing the district court's order denying a motion to suppress statements under the Fifth Amendment, we accept the district court's factual findings unless clearly erroneous and view the evidence in the light most favorable to the Government." *Cash*, 733 F.3d at 1276. Whether, based on that view of the evidence, an officer's statement is interrogation is a legal matter we review de novo. *See id.* at 1276–78; *United States v. Davis*, 773 F.3d 334, 338 (1st Cir. 2014) (Baldock, J., sitting by designation) ("[T]he determination as to whether police interrogation occurred at all depends on the totality of the circumstances, a balancing analysis commonly considered amenable to plenary review where, as here, the underlying historical facts are not in dispute." (original brackets and internal quotation marks omitted)); *United States v. Rommy*, 506 F.3d 108, 134 (2d Cir. 2007) ("On *de novo* review of [the defendant's] legal challenge, we conclude that such [follow-up] questions did not transform the meeting into an interrogation . . . ."). But even when it is determined that officers engaged in interrogation, whether the suspect's statement was spontaneous (or instead made as a result of the interrogation) is a factual finding that we review for clear error. *See United*

**10**

*States v. Sherwood*, 98 F.3d 402, 409 (9th Cir. 1996), *as amended* (Oct. 28, 1996); *United States v. Zuber*, 485 F. App'x 921, 923 (10th Cir. 2012) (unpublished).

### C. Defendant's Arguments

Defendant seeks to suppress incriminating statements that he made during the search of his body. His opening brief refers to "Mr. Yepa acknowledging blood and scratches on his body, admitting he wanted to go to sleep, implying he had been naked while blood was flying, indicating he was alone with Ms. Becenti and describing conscious movement from one part of his house to the other that matched the blood spatter testimony." Aplt. Br. at 42. He must establish that the challenged statements were (1) the result of words or actions of law-enforcement officers (2) that constituted interrogation. In our view he fails in that endeavor.

To begin with, the conduct of the search was not in itself interrogation. *See Innis*, 446 U.S. at 301 ("words or actions on the part of the police . . . normally attendant to arrest and custody" are not interrogation). Further, the district court found that all Defendant's statements "were spontaneous and were not the result of interrogation." R., Vol. 4 at 1136. In particular, the court noted that the questions "with who?" and "who were you with?" about 45 and 47 minutes into the search were follow-up questions that "were simply neutral efforts to clarify [Defendant's] spontaneous, volunteered statements, and did not constitute interrogation." *Id.*

Defendant disputes the district court's findings and conclusions, but we are not persuaded that the court committed reversible error. First, Defendant seeks to suppress his statements acknowledging that his toes, feet, and face were bloody, and that he had

abrasions on his body. He claims that those statements were the product of Bourgeois's question: "Do you have any scars? Marks? Anything like that?" Tr. at 7. We reject the argument. Bourgeois asked his question five minutes and 37 seconds into the search, and Defendant's next statement—"Don't they have my file here already?"—was not responsive. Tr. at 7 (CD at 5:37–6:15). It was not until more than 10 minutes later, as he was being photographed, that Defendant stated that his toes, feet, and face were bloody. And it was eight minutes after that when Defendant pointed out some abrasions on his body. The district court did not clearly err in finding that Defendant's statements were spontaneous, not made in response to Bourgeois's much earlier question.

Defendant next argues that Bourgeois goaded him into making incriminating statements by saying, "He's a tough guy," Tr. at 9, and "You're not a real modest guy, are you?" *id.* at 14. He seeks to suppress statements that he was tired, *see id.* at 24, 25, and that "it got sick," *id.* at 29, as the fruits of these two comments. Defendant's argument depends on a strained interpretation of what Bourgeois said. The district court did not clearly err in finding that Bourgeois and the others were "business-like but polite" throughout the search. R., Vol. 4 at 1137. Bourgeois's two comments do not appear rude or combative in context. Although their meanings are not entirely clear from the record, the first appears to be a reference to Defendant's coping with the cold, while the second to his comfort with being photographed. Neither do Defendant's responses to those two comments suggest that he interpreted them as goading or coercive. We conclude that the two comments did not constitute interrogation. Moreover, no reasonable person could

**12**

have found that Defendant's statements 16, 18, and 29 minutes after the second of the two comments were induced by the comments.

Defendant claims that he was particularly vulnerable because he was tired, intoxicated, and under tremendous emotional stress. He argues that a reasonable officer would necessarily conclude that it would not take much (say, a little goading) to induce him to make incriminating statements, and Bourgeois's comments must therefore be considered interrogation. *See Innis*, 446 U.S. at 302 n.8 ("Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect."). We are not persuaded. Given the district court's fact finding about the tone of the officers' statements, we do not believe that a reasonable officer would think that his statements would likely lead Defendant to incriminate himself.

Finally, Defendant argues that 45 minutes into the search the officers explicitly interrogated him about the homicide. To keep the context clear, we repeat in full the exchange that included the most incriminatory statements that he challenges:

> Sedillo: I'll get you some water.
> Defendant: Oh, man, it got sick, dude. (Inaudible). (Inaudible) at my house or what?
> Male Speaker: (Inaudible).
> Defendant: How come you -- dude. (Inaudible).
> Male Speaker: (Inaudible).
> Defendant: (Inaudible). By the feed store. (Inaudible).
> Male Speaker: (Inaudible). [Perhaps "*What's that?*"]
> Defendant: (Inaudible). That chick.

**13**

Bourgeois: *With who?*

Defendant: She was by herself. Me -- I was with -- I don't wanna mention no names right now and get anybody in trouble, you know. But we picked her up over there, and then (inaudible). (Inaudible), you know, and everything was good. She had (inaudible). All that doing herself, man. Guarantee crazy, man. We were in that room on this side of my mom's. I said, my mom's gonna be home, let's go on the other side, man. I didn't even know she was bleeding like that, man. Nobody else was there. We just got dropped off over there at the house.

Male Speaker: Dropped off --

Defendant: Yeah. (Inaudible).

Bourgeois: *Who were you with?*

Male Speaker: They won't get in any trouble for just dropping you off. *Who were you with?*

Defendant: I'm not gonna say anything if I -- I'll probably talk to maybe later, dude.

Male Speaker: Okay.

Defendant: I'm gonna be in trouble. (Inaudible).

Bourgeois: Maybe you don't wanna sit down but I wanna sit down.

Defendant: I just wanna lay down. I wanna (inaudible). Aye, there's no way I would do such a thing, man. After five months sober (inaudible), I took two shots (inaudible), bro. Three shots. And then all of this stupid drama happens. I've been good, man. (Inaudible). I changed for my boy man. Oh man. My son (inaudible). Thank you, bro.

Tr. at 29–31 (CD at 44:27–49:20) (emphasis added).

The first of Defendant's statements about the murder in this passage is: "Oh, man, it got sick, dude." The district court was clearly correct in finding that the statement was not in response to interrogation. No one could possibly construe, "I'll get you some water," as an interrogation.

In the remainder of this portion of the transcript, the officers asked three or four questions: "What's that?"; "With who?"; and "Who were you with?" The district court stated that none of those questions constituted interrogation, because they "were simply neutral efforts to clarify [Defendant's] spontaneous volunteered statements." R., Vol. 4

**14**

at 1136. We agree regarding the first two questions: "What's that?" and "With who?" Perhaps there could be some doubt about the final two questions—in which an officer asked, "Who were you with?"—because the officers appeared to be pressing the point after Defendant declined to respond initially. But we need not resolve the issue, because Defendant never answered the questions. The statements after those questions that Defendant seeks to suppress were not responsive and therefore should be considered spontaneous and volunteered. *See Gay*, 774 F.2d at 379 (unresponsive statement is admissible); *Parson,* 387 F.2d at 946 (same); LaFave § 6.7(d) (unresponsive answer may qualify as equivalent of being volunteered).

Defendant suggests on appeal, however, that some interrogation took place in the "inaudible" parts of this exchange. Some of those parts may have been in Towa, and Defendant asserts: "Although a conversation with Chief Toya apparently started in Towa, the audible English words [Defendant] spoke seemed as though he were answering a question." Aplt. Br. at 48. But without a better factual foundation, that assertion is speculation. First, the portion of the possibly Towa conversation spoken by anyone other than Defendant is very brief, at most only a few words. The brevity makes it unlikely that it consisted of any significant questioning. Second, an interrogation at that point in the execution of the search warrant would have been totally out of character with the conduct of the officers for the preceding 45 minutes. As already noted, the officers were focused on executing the warrant and did nothing to draw Defendant out regarding the death of Ms. Becenti. And third, the one person who undoubtedly could understand any conversation in Towa that might be audible on the recording is Defendant; yet he has

**15**

presented no evidence regarding what was said. In this circumstance, we decline to reverse and remand for the district court to make findings regarding the meaning of any recorded conversation in Towa.

### III. CONCLUSION

We **AFFIRM** Defendant's conviction.