FILED
**United States Court of Appeals**
**Tenth Circuit**

**December 29, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

FABIAN I. SANCHEZ,

      Defendant-Appellant.

No. 19-2092

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. 1:17-CR-01231-JAP-1)**

---

Margaret Katze, Assistant Federal Public Defender, Office of the Federal Public Defender, Albuquerque, New Mexico, for Appellant.

Christopher S. McNair, Assistant United States Attorney (John C. Anderson, United States Attorney, with him on the brief), Office of the United States Attorney, Las Cruces, New Mexico, for Appellee.

---

Before **TYMKOVICH**, Chief Judge, **EBEL**, and **BACHARACH**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

---

    Fabian Sanchez is a convicted felon with a lengthy rap sheet. Late one night, he was approached by two police officers who suspected him of attempting

to break into a vehicle sitting in the back area of a hotel parking lot. He was wearing a trench coat with a loaded gun in the pocket. After routine questioning, he was caught in a lie and then fled. During the chase, his trench coat ended up on the ground after one of the officers unsuccessfully tased Mr. Sanchez, but he kept running. He eventually ran back toward his trench coat but was tackled by the officers before he could get there. Mr. Sanchez was arrested, and the loaded gun was discovered in his trench coat.

Mr. Sanchez was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He filed a motion to suppress the gun, and the government filed a motion in limine to admit an incriminating statement Mr. Sanchez made after his arrest. The district court denied Mr. Sanchez's motion and granted the government's motion. Mr. Sanchez pleaded guilty on the condition that he could appeal these rulings. He was then sentenced pursuant to the Armed Career Criminal Act (ACCA).

On appeal, Mr. Sanchez argues (1) the officers lacked reasonable suspicion to seize him and lacked probable cause to arrest him, violating his Fourth Amendment rights; (2) the officers searched his trench coat without a warrant even though he did not voluntarily abandon it, violating his Fourth Amendment rights; and (3) his incriminating statement was the product of custodial interrogation without *Miranda* warnings, violating his Fifth Amendment rights.

Mr. Sanchez also contends that his guilty plea was not knowing and voluntary. And finally, Mr. Sanchez argues his sentence pursuant to the ACCA was made in error.

We reject each of these arguments and therefore AFFIRM the district court.

# I. Background[1]

On a November night in 2016, Rio Rancho Police Department Officer Aaron Brown was on patrol in an unmarked truck wearing plain clothes. Earlier in the day he received a warning from police dispatch to look out for a stolen silver Hyundai vehicle in the area. Officer Brown was driving through an Extended Stay America Hotel parking lot when he noticed an unoccupied Hyundai. This was notable to him not only because of the warning fresh in his mind from earlier in the day, but also because he had recovered stolen vehicles from this parking lot before.

Officer Brown's nearly eight years of training and experience dealing with stolen vehicles also led him to find the Hyundai suspicious because, unlike most vehicles, the Hyundai was parked away from the curb and its left front and back tires were sitting on the white line. Officer Brown's suspicions increased when he relayed the plate to dispatch and it returned a registration to a 2005 Hyundai.

---

[1] These facts are taken from the motion to suppress hearing transcript at which Officer Brown and Officer Cordova testified.

-3-

But he knew this vehicle was much newer because of its body style, lack of damage, and relatively new rims and tires. Officer Brown parked and then exited his vehicle to check the last four numbers of the Hyundai's vehicle identification number (VIN). They did not match the VIN associated with the license plate.

Officer Brown called for backup so he could check the entire VIN safely. Officer Alex Cordova responded and arrived at the Extended Stay parking lot after 9:00 p.m., parking next to Officer Brown's vehicle. Just as the officers were about to approach the Hyundai to retrieve the full VIN, a Lexus entered the parking lot. It backed into the space next to the Hyundai, leaving two to three feet between the vehicles. The officers observed Mr. Sanchez exit the Lexus in a loose-fitting trench coat. He left the driver's side door open, creating a barrier between the two parked vehicles and substantially obstructing the officers' view of him. Mr. Sanchez walked to the back of the Lexus and retrieved a toolbox, then crouched down with the toolbox in between the vehicles. Based on these circumstances, Officer Brown thought Mr. Sanchez was going to try to "punch the lock," or "manipulat[e] the driver's side door outside lock to enter the [Hyundai]." R., Vol. 1 at 122. The officers resumed approaching the Hyundai to investigate and retrieve the full VIN.

Officer Brown approached the front of the Lexus while Officer Cordova went around back. After the officers identified themselves as police, Officer

Brown shut the driver's side door of the Lexus so he could see Mr. Sanchez's hands and ensure he did not have a weapon. Officer Brown next ordered Mr. Sanchez to put down the toolbox he was holding, which he did. Mr. Sanchez then placed his hands in his trench coat pockets.

Officer Brown began a conversation with Mr. Sanchez in a mellow, conversational tone. He asked, referring to the Hyundai, "Hey, whose car is this? Is this your car?" Mr. Sanchez responded that it was his girlfriend's car and he was working on it. Then Officer Brown asked, "Well, whose is the Lexus?" Mr. Sanchez answered it was not his car. Officer Brown continued, "Whose car is it?" and Mr. Sanchez responded, "Well, I didn't get out of it." To this, Officer Brown chuckled and stated, "I've been sitting here watching you. I saw you get out of the Lexus." Then Officer Brown noticed that Mr. Sanchez's demeanor changed, distancing himself from the Lexus. Mr. Sanchez also began scanning the parking lot and backing up with his hands in his pockets. In both officers' training and experience, they have learned that roaming eyes in these situations means a person is looking for backup or getting ready to flee. The officers were also worried that the trench coat's deep pockets could hold weapons.

Concerned for his safety, Officer Brown next asked Mr. Sanchez in a more authoritative tone to put his hands on his head for a pat-down search. Mr. Sanchez started to back away and either asked, "Why?" or stated, "I didn't do

nothing."[2] Officer Brown commanded Mr. Sanchez to put his hands on his head one or two more times before Mr. Sanchez fled.

Both officers chased after Mr. Sanchez and yelled at him to stop, but he did not comply. During the pursuit, they could see Mr. Sanchez looking back at them and reaching into his right trench coat pocket while in full stride. This made the officers believe Mr. Sanchez was reaching for a weapon, so Officer Cordova deployed his taser at Mr. Sanchez. But it did not work correctly. Officer Brown has been tased before in training, and he testified that it caused his muscles to completely lock up. Officer Cordova also testified that the taser did not appear to affect Mr. Sanchez because, if it had been effective, Mr. Sanchez would have fallen to the ground instantly. But here, Mr. Sanchez "never really missed a step." R., Vol. 1 at 140.

Shortly after Mr. Sanchez was unsuccessfully tased, the officers observed Mr. Sanchez take off his trench coat and throw it to the ground while he was running. Then Mr. Sanchez made a U-turn and began running back toward the vehicles and his trench coat. Before he could get there, Mr. Sanchez collided with the officers.

---

[2] Officer Brown testified as to the former, and Officer Cordova testified as to the latter.

Officer Cordova handcuffed Mr. Sanchez, and Officer Brown went back to retrieve Mr. Sanchez's trench coat. When Officer Brown picked up the trench coat, he noticed an uneven weight distribution and that the item causing this was heavier than a wallet or keys. In the right pocket of the trench coat, Officer Brown discovered a .380 Jimenez Arms handgun with a live bullet in the chamber and five rounds in the magazine. Officer Brown called out to Officer Cordova, "Hey, I think we have a gun." When he said this, Officer Brown did not make eye contact with Mr. Sanchez. Officer Brown was alerting Officer Cordova to the weapon so that he could be vigilant as to the presence of other weapons on Mr. Sanchez's person. Immediately following Officer Brown's alert, Mr. Sanchez stated, "That's why I ran."

Mr. Sanchez was charged with violating 18 U.S.C. § 922(g)(1) for being a felon in possession of a firearm. He filed a motion to suppress the gun, arguing it was the fruit of the poisonous tree due to a lack of reasonable suspicion that he was committing a crime and a lack of probable cause at various times during his encounter with the officers. The government filed a motion in limine to admit statements of Mr. Sanchez, including "That's why I ran" after Officer Brown notified Officer Cordova he had found a gun in the trench coat. The district court considered both motions at the same hearing. It denied Mr. Sanchez's motion to

suppress and granted the government's motion in limine. Mr. Sanchez appeals these rulings.

After the gun and his incriminating statement were ruled admissible, Mr. Sanchez decided to enter a guilty plea. The plea agreement laid out the elements of Mr. Sanchez's crime of conviction as (1) the defendant knowingly possessed a firearm or ammunition in New Mexico, (2) the defendant was convicted of a felony before he possessed a firearm or ammunition, and (3) before the defendant possessed the firearm or ammunition, the firearm or ammunition had moved at some time from one state to another. These elements were echoed at Mr. Sanchez's change of plea hearing, at which the district court accepted Mr. Sanchez's guilty plea.

Two months after Mr. Sanchez was sentenced, the Supreme Court decided *Rehaif v. United States*, 139 S. Ct. 2191 (2019). In *Rehaif*, the Court held that to convict a defendant pursuant to § 922(g)(1), the government must prove a defendant knew he was a convicted felon at the time of the incident—an element Mr. Sanchez was not advised of prior to his guilty plea. As a result, Mr. Sanchez appeals the voluntariness of his guilty plea.

Mr. Sanchez was ultimately sentenced to 188 months' imprisonment pursuant to the ACCA, 18 U.S.C. § 924(e). His three qualifying convictions under the ACCA included (1) two 2006 convictions for aggravated assault with a

deadly weapon under New Mexico law, (2) a February 2010 conviction for residential burglary under New Mexico law, and (3) an April 2010 conviction for residential burglary under New Mexico law. He disputes that these crimes are qualifying convictions under the ACCA, so he also appeals his sentence.

## II.  Analysis

Mr. Sanchez challenges the district court's (1) ruling on his motion to suppress; (2) decision granting the government's motion in limine; (3) acceptance of his guilty plea; and (4) imposition of his sentence under the ACCA. For the reasons explained below, we affirm the district court on each of these issues.

### A.  Motion to Suppress

#### 1.  Reasonable Suspicion

Mr. Sanchez first argues the district court erred in denying his motion to suppress the gun because the officers lacked reasonable suspicion to seize him. On review of a ruling on a motion to suppress, we "view the evidence in the light most favorable to the prevailing party and accept the district court's findings of fact unless they are clearly erroneous." *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017). Moreover, "[w]hile the existence of reasonable suspicion is a factual determination, the ultimate determination of the reasonableness of a . . . seizure under the Fourth Amendment is a question of law

reviewed de novo." *United States v. Fonseca*, 744 F.3d 674, 680 (10th Cir. 2014).

A seizure without reasonable suspicion is unreasonable and violates the Fourth Amendment. *See* U.S. Const. amend. IV; *United States v. Lambert*, 46 F.3d 1064, 1069 (10th Cir. 1995). To justify a seizure, an officer must point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the seizure. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Reasonableness is determined "in light of common sense and ordinary human experience." *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997). The totality of the circumstances must be considered, and neither the officer nor the court need "rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002). This is "not . . . an onerous standard," and it "requires considerably less than a preponderance of the evidence and obviously less than probable cause." *United States v. Gurule*, 935 F.3d 878, 885 (10th Cir. 2019), *cert. denied*, 140 S. Ct. 1285 (2020) (internal quotation marks omitted). "[I]f there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to [seize] him briefly while attempting to obtain additional information." *Hayes v. Florida*, 470 U.S. 811, 816 (1985).

We conclude the officers had reasonable suspicion of criminal activity from the inception of their encounter with Mr. Sanchez, justifying a seizure.[3] Officer Brown and Officer Cordova knew the Extended Stay parking lot was a repository for stolen vehicles since they had recovered stolen vehicles from the lot before. Officer Brown ran the Hyundai's license plate and learned it did not belong to the vehicle, making him suspect it was a stolen vehicle. Officer Brown and Officer Cordova then observed Mr. Sanchez pull into the Extended Stay parking lot and back the vehicle he was driving into the parking space right by the Hyundai in the back of the lot. The officers observed Mr. Sanchez exit his vehicle, retrieve a toolbox, and crouch down by the driver's side door of the Hyundai.

These facts support a reasonable suspicion that Mr. Sanchez was committing or attempting to commit a criminal offense, justifying an investigatory encounter. The facts support the rational inferences that the Hyundai was stolen and that Mr. Sanchez was either attempting to break into it or was associated with a stolen vehicle. Moreover, common sense and ordinary human experience lead to the rational inference that someone late at night in a hotel parking lot with a toolbox by the driver's side of a vehicle door may be attempting to break into the

---

[3] The district court concluded the encounter between the officers and Mr. Sanchez was initially consensual, then reasonable suspicion developed and Mr. Sanchez was seized. The parties dispute when Mr. Sanchez was initially seized. Because we conclude reasonable suspicion existed at the inception of the encounter, the point of seizure is irrelevant, and we do not address it.

vehicle. *See Mendez*, 118 F.3d at 1431. This inference is further supported by the fact that the officers had recovered stolen vehicles from this parking lot before.

There may have been an innocent explanation for Mr. Sanchez's conduct, but the officers did not have to rule out innocent conduct to have reasonable suspicion. *See Arvizu*, 534 U.S. at 274. Indeed, even if Mr. Sanchez's conduct was "ambiguous and susceptible of innocent explanation," it was objectively reasonable for Officer Brown and Officer Cordova "to detain [Mr. Sanchez] to resolve the ambiguity." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). Accordingly, the officers had reasonable suspicion of criminal activity from the inception of their encounter with Mr. Sanchez, so his seizure—if one occurred at all—did not violate his Fourth Amendment rights.[4]

---

[4] Mr. Sanchez contends that because the government did not argue that the officers had reasonable suspicion he was engaged in criminal activity at the inception of the encounter below, it waived the argument and the panel cannot consider it. But the panel can exercise its discretion to affirm the district court on an alternative ground. *See United States v. Watson*, 766 F.3d 1219, 1236 n.12 (10th Cir. 2014); *c.f. United States v. Hall*, 798 F. App'x 215, 218 (10th Cir. 2019) (declining to exercise discretion to reach the government's forfeited argument and therefore declining to affirm on an alternative ground). To determine whether to exercise this discretion, the court considers "whether the ground was fully briefed and argued here and below, whether the parties have had a fair opportunity to develop the factual record, and whether, in light of . . . the uncontested facts, [its] decision would involve only questions of law." *Harvey v. United States*, 685 F.3d 939, 950 n.5 (10th Cir. 2012) (alterations incorporated). Here, the parties fully briefed the issue on appeal, they had a fair opportunity to

(continued...)

-12-

Reasonable suspicion only built from there. After the officers approached Mr. Sanchez and announced themselves as police, Officer Brown began asking Mr. Sanchez questions. Mr. Sanchez's answers did nothing to dispel the officers' reasonable suspicion of criminal activity. Mr. Sanchez offered a connection to the suspected-stolen Hyundai, claiming it was his girlfriend's vehicle. Even though the officers had just witnessed Mr. Sanchez drive up in the Lexus, Mr. Sanchez claimed it was not his and that he did not get out of it. Officer Brown called him out on this untruth, chuckling and explaining that he knew Mr. Sanchez's statement was a lie. These facts further supported the officers' reasonable suspicion that Mr. Sanchez was engaging in criminal activity. *See United States v. Simpson*, 609 F.3d 1140, 1149 (10th Cir. 2010) ("[L]ies, evasions or inconsistencies about any subject while being detained may contribute to reasonable suspicion."). Any seizure of Mr. Sanchez during his questioning and immediately after was therefore supported by reasonable suspicion of criminal activity.

Then Mr. Sanchez's demeanor changed: he put his hands in the deep pockets of his trench coat, slowly backed away from Officer Brown, and scanned

---

[4](...continued)
develop the factual record at the motions hearing, and resolving this issue would only involve questions of law because the facts are uncontested in the record. Because these considerations weigh in favor of the court exercising its discretion to consider the argument, we do so.

the parking lot. This prompted Officer Brown to order Mr. Sanchez to submit to a pat-down search, which is permitted by the Fourth Amendment if an officer "develop[s] an articulable and reasonable suspicion that [a] subject is armed and dangerous" during an investigatory detention. *See Gurule*, 935 F.3d at 885. Before Officer Brown could conduct a pat-down search, however, Mr. Sanchez fled, so no seizure requiring reasonable suspicion occurred. *See United States v. Martin*, 613 F.3d 1295, 1301 (10th Cir. 2010) (explaining defendant was not seized when officer ordered him to place his hands on the wall); *United States v. Lee*, 458 F. App'x 741, 744 (10th Cir. 2012) (unpublished) (internal quotation marks omitted) ("Because the officer had not yet begun a pat down search . . . there is no need for the Court to consider whether the officers had reasonable suspicion to believe [the defendant] was armed and dangerous.").

In sum, we find no Fourth Amendment violation for a lack of reasonable suspicion.

### 2. *Probable Cause to Arrest*

Then Mr. Sanchez fled. While in pursuit of Mr. Sanchez, Officer Cordova attempted to tase him, but the taser did not work properly, so Mr. Sanchez was unfazed.[5] The officers eventually tackled Mr. Sanchez and placed him under

---

[5] Mr. Sanchez argues this was a seizure unsupported by reasonable suspicion. The taser was ineffective, however, so although Officer Cordova

(continued...)

arrest. He complains that his arrest violated his Fourth Amendment rights because it was unsupported by probable cause. The district court disagreed, finding no Fourth Amendment violation stemming from Mr. Sanchez's arrest.

We review a district court's determination of probable cause de novo and factual determinations for clear error, giving "due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *See Ornelas v. United States*, 517 U.S. 690, 699 (1996). "A warrantless arrest violates the Fourth Amendment unless it was supported by probable cause." *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1216 (10th Cir. 2008). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Id*.

The district court found, and we agree on de novo review, that the officers had probable cause to arrest Mr. Sanchez for violation of N.M. Stat.

---

[5](...continued)
attempted to restrain Mr. Sanchez via physical force by deploying his taser at Mr. Sanchez, he was not seized because the taser did not physically overpower him. *See, e.g.*, *United States v. Salazar*, 609 F.3d 1059, 1065 (10th Cir. 2010) ("[A] fleeing man is not seized until he is physically overpowered."). And even if he was seized, the officers had reasonable suspicion Mr. Sanchez was engaging in criminal activity, as well as probable cause to arrest him for violation of N.M. Stat. § 30-22-1(B) for fleeing.

§ 30-22-1(B),[6] which prohibits fleeing from the police when a person knows the police are trying to apprehend or arrest him and the police had "reasonable suspicion or probable cause to apprehend or arrest [the] person *prior* to the flight." *Romero v. Story*, 672 F.3d 880, 886 (10th Cir. 2012) (emphasis in original). An investigatory stop satisfies the element of apprehension under New Mexico law. *Id.* The officers had reasonable suspicion that Mr. Sanchez was engaged in criminal activity—attempting to break into a vehicle—prior to his flight. Mr. Sanchez also knew Officer Brown intended to detain him because Officer Brown asked him to submit to a pat-down search. The officers' reasonable suspicion and their awareness of Mr. Sanchez's knowledge provided probable cause to arrest Mr. Sanchez for fleeing. *See id.* Because Mr. Sanchez's arrest was supported by probable cause and did not violate his Fourth Amendment rights, we affirm the district court's denial of the suppression motion on this basis.

### 3. *Abandoned Property*

Mr. Sanchez also contends the district court erred in denying his motion to suppress the gun because Officer Brown illegally searched his trench coat without

---

[6] "Resisting, evading or obstructing an officer consists of: . . . B. intentionally fleeing, attempting to evade or evading an officer of this state when the person committing the act of fleeing, attempting to evade or evasion has knowledge that the officer is attempting to apprehend or arrest him."

a warrant. In Mr. Sanchez's view, the taser caused his trench coat to fall to the ground, so he did not voluntarily abandon it or his expectation of privacy in it.

We review a district court's determination that property was abandoned for clear error. *United States v. Hernandez*, 7 F.3d 944, 947 (10th Cir. 1993). The Fourth Amendment permits warrantless searches and seizures of abandoned property. *See United States v. Ruiz*, 664 F.3d 833, 841 (10th Cir. 2012). To determine whether property is abandoned, the court must assess "whether the defendant retained a reasonable expectation of privacy in the property." *Id*. (internal quotation marks omitted). "An expectation of privacy is a question of intent which may be inferred from words, acts, and other objective facts." *Id*. (internal quotation marks omitted). The abandonment must also be voluntary. *See Hernandez*, 7 F.3d at 947.

Based on the undisputed testimony at the suppression hearing, the district court did not clearly err in holding that Mr. Sanchez voluntarily abandoned his trench coat. Both officers testified that the taser did not deploy properly, so it did not work as intended. Indeed, instead of being stunned or unable to move, Mr. Sanchez was able to continue fleeing the officers. This evidence supports the district court's conclusion that Mr. Sanchez "subjectively intended to drop his trench coat and voluntarily did so . . . in a public place." R., Vol. 2 at 384. Mr. Sanchez may have intended to come back and get his trench coat, but "[e]ven if

he did, he would have lacked an objectively reasonable expectation of privacy after [discarding it in a public parking lot]." *United States v. Juszczyk*, 844 F.3d 1213, 1215 (10th Cir. 2017). As a result, Officer's Brown's search of Mr. Sanchez's abandoned trench coat did not implicate the Fourth Amendment. The district court's denial of the suppression motion on this basis is thus also affirmed.

\*  \*  \*

The officers had reasonable suspicion Mr. Sanchez was engaged in criminal activity before and throughout their encounter with him, justifying his detention. And when he fled and voluntarily abandoned his trench coat, the officers had probable cause to arrest him and free rein to search his trench coat. Because Mr. Sanchez's Fourth Amendment rights were not violated, the district court did not err in denying Mr. Sanchez's motion to suppress.

## B. *Motion in Limine – Incriminating Statement*

Mr. Sanchez further argues the district court erred in granting the government's motion in limine to admit an incriminating statement.[7] After he was captured, Mr. Sanchez said, "That's why I ran," in response to a comment made

---

[7] The government argues that Mr. Sanchez's challenge to the motion in limine ruling falls within the scope of his appellate waiver. The court need not reach this issue, however, because even if Mr. Sanchez did not waive the argument, we conclude that the district court did not err in admitting Mr. Sanchez's incriminating statement.

by Officer Brown about the discarded gun. Mr. Sanchez claims this was custodial interrogation without *Miranda* warnings and thus violated his Fifth Amendment right against self-incrimination.

Whether an officer's statement is interrogation is reviewed de novo, but whether a suspect's statement was spontaneous is a factual finding reviewed for clear error. *United States v. Yepa*, 862 F.3d 1252, 1257 (10th Cir. 2017). More generally, when reviewing a district court's decision to admit statements that it determined were not the product of a Fifth Amendment violation, we "accept the district court's factual findings unless clearly erroneous and [the evidence is] view[ed] . . . in the light most favorable to the Government." *Id*. at 1258.

The Fifth Amendment guarantees the right of the accused against self-incrimination. U.S. Const. amend. V. Consequently, a defendant subjected to custodial interrogation "must be warned prior to any questioning that he has the right to remain silent" and to an attorney, and that anything he says can be used against him. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). If a defendant is not apprised of his rights, or if he is but he declines to knowingly and voluntarily waive these rights and agree to answer questions, then "no evidence obtained as a result of interrogation can be used against him." *Id*.

"[C]ustody does not automatically render every exchange an interrogation." *Yepa*, 862 F.3d at 1257 (internal quotation marks omitted; alterations

-19-

incorporated). Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*. (internal quotation marks omitted); *see Rhode Island v. Innis*, 446 U.S. 291, 301–02 (1980). Even so, "words or actions on the part of the police normally attendant to arrest and custody are not interrogation." *Yepa*, 862 F.3d at 1257 (internal quotation marks omitted; alterations incorporated). This inquiry is objective, focusing "on the perceptions of a reasonable person in the suspect's position rather than the intent of the investigating officer." *Id*. (internal quotation marks omitted). Although "an investigating officer's intention may be relevant, . . . it is the objectively measured tendency of an action to elicit an incriminating response which is ultimately determinative." *United States v. Rambo*, 365 F.3d 906, 910 (10th Cir. 2004).

It is undisputed that Mr. Sanchez was not given *Miranda* warnings prior to making his incriminating statement and that Mr. Sanchez was in custody when he made it. Thus, admission of his incriminating statement would violate Mr. Sanchez's Fifth Amendment right against self-incrimination if he had been subjected to interrogation. But the district court's findings based on the undisputed evidence show otherwise. After Officer Brown picked up the trench coat and discovered the gun, he said, "Hey, I think we have a gun." When he did

this, he did not make eye contact with Mr. Sanchez. The statement was made to Officer Cordova, who had just arrested Mr. Sanchez and was thus near him. A reasonable person in Mr. Sanchez's position would understand that he was not being interrogated, so his statement was not the result of custodial interrogation but was instead spontaneous.

*Rhode Island v. Innis* provides an instructive example of a police statement about a weapon that did not amount to functional interrogation. In *Innis*, the defendant was arrested, advised of his *Miranda* rights, and declined to waive them. 446 U.S. at 294. On the way to the police station, the officers began to speak about the undiscovered murder weapon. *Id*. One of the officers testified:

> I was talking back and forth with [a second police officer] stating that I frequent this area while on patrol and [that because a school for handicapped children is located nearby,] there's a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves.

*Id*. at 294–95. Apparently reviving his moral compass, the defendant interrupted and told the officers to turn around so he could show them where the gun was. *Id*. at 295. They turned around and the defendant led them to the gun. *Id*. The Supreme Court ruled that the officers' conversation was not reasonably likely to elicit an incriminating response and was thus not interrogation. *Id*. at 302. The Court reasoned that the defendant was not "peculiarly susceptible to an appeal to

-21-

his conscience," the conversation only consisted of a few off-hand remarks, and the record did not support the defendant's assertion that the officers' comments were "particularly evocative." *Id*. at 302–03.

Like *Innis*, the record here shows that Officer Brown's statement was not particularly evocative. It was a short warning to Officer Cordova about the presence of a weapon. Also like *Innis*, the statement was made to another officer, not the defendant. To hold that *Innis*—which involved comments about the missing gun's potential danger to handicapped children, likely to appeal to the defendant's conscience—did not involve an interrogation, but this case does, would defy common sense. A reasonable person in Mr. Sanchez's position would therefore understand that he was not being interrogated, and admission of his incriminating statement would not violate his Fifth Amendment right against self-incrimination.

And even if Officer Brown should have known that his statement was reasonably likely to evoke an incriminating response from Mr. Sanchez, *see Yepa*, 862 F.3d at 1257, this statement is one normally attendant to arrest and custody, as it warned Officer Cordova to be alert for more weapons. *See, e.g.*, *United States v. Bennett*, 626 F.2d 1309, 1313 (5th Cir. 1980) ("[W]e believe it clear that those words and actions, which are necessary or appropriate to inform fellow officers of a potential threat to their own safety and that of others during the

-22-

course of an arrest or custody, are 'normally attendant.'"). Accordingly, it was not an interrogation. *See Yepa*, 862 F.3d at 1257 (holding defendant was not interrogated by police when, following his arrest, the police photographed him, seized his bloody clothes, and verbally informed defendant of these procedures because these words and actions are normally attendant to arrest and custody).

In sum, we find that a reasonable person in Mr. Sanchez's position would understand that Officer Brown's statement warning Officer Cordova about a gun was not interrogation. And regardless, the officer safety statement was not interrogation because it is a statement normally attendant to arrest and custody. We accordingly affirm the district court's grant of the government's motion in limine.

### C. Guilty Plea

Prior to pleading guilty, Mr. Sanchez was not informed that an element of being a felon in possession is a defendant's knowledge of his felon status at the time of his firearm possession. This was a common occurrence at the time, because courts did not understand knowledge-of-status to be an element of 18 U.S.C. § 922(g)(1). *See, e.g.*, *United States v. Silva*, 889 F.3d 704, 711 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 1319 (2019). But in *Rehaif v. United States*—decided after the district court accepted Mr. Sanchez's guilty plea—the Supreme Court clarified "that in a prosecution under 18 U.S.C. § 922(g) and

§ 924(a)(2), the Government must prove . . . that the defendant . . . knew he belonged to the relevant category of persons barred from possessing a firearm." 139 S. Ct. at 2200.

Mr. Sanchez now challenges his guilty plea as not knowing and voluntary because he was not informed of an element of his crime of conviction. He did not raise this argument below, however, so it is subject to plain error review. To prevail under plain error, a defendant must "successfully run the gauntlet created by [this] rigorous . . . standard of review." *United States v. McGehee*, 672 F.3d 860, 876 (10th Cir. 2012). It requires a defendant to demonstrate

> (1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights. If he satisfies these criteria, [the] Court may exercise discretion to correct the error if (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*Id*. An error can also be plain "if it is clear or obvious at the time of the appeal." *Id*. at 681, 686–87 (internal quotation marks omitted). Furthermore, "[a]n error seriously affects [a] defendant's substantial rights . . . when the defendant demonstrates that there is a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *United States v. Rosales-Miranda*, 755 F.3d 1253, 1258 (10th Cir. 2014) (internal quotation marks omitted); *see United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004) ("[A] defendant who seeks reversal of his conviction after a guilty plea, on the ground

that the district court committed plain error under Rule 11, must show a reasonable probability that, but for the error, he would not have entered the plea."); *United States v. Trujillo*, 960 F.3d 1196, 1201 (10th Cir. 2020), *cert. filed*, Oct. 23, 2020 (No. 20-6162), (same). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Trujillo*, 960 at 1201.[8]

When a district court fails to inform a defendant of the knowledge-of-status element of a felon in possession charge, we have explained

> the consequence of the error can be measured based on the strength of the government's evidence and the defendant's own admissions. For example, where the evidence supporting the defendant's knowledge-of-status is strong, or where the defendant admitted knowledge of his felony status, we can assume the defendant would have pleaded guilty even if he had been aware the government would be required to prove his knowledge of status.

*Id*. at 1207. Thus, "under the prejudice prong of plain-error review, a defendant must demonstrate that the record as a whole fails to provide a sufficient factual basis to support the guilty plea." *United States v. Fisher*, 796 F. App'x 504, 510

_____

[8] Mr. Sanchez asserts the district court committed a structural error, which satisfies the third prong of plain error review—an error affecting a defendant's substantial rights—"without regard to the mistake's effect on the proceeding." *Trujillo*, 960 F.3d at 1201. In the Tenth Circuit, however, "a district court['s] fail[ure] to inform a defendant of the knowledge-of-status element of a felon in possession charge" is not a structural error. *Id*. at 1205.

(10th Cir. 2019) (unpublished) (internal quotation marks omitted); *see also United States v. Carillo*, 860 F.3d 1293, 1301 (10th Cir. 2017). "In assessing factual sufficiency under the plain error standard, this court may look beyond those facts admitted by the defendant during the plea colloquy and scan the entire record for facts supporting his conviction." *Fisher*, 796 F. App'x at 510 (internal quotation marks omitted; alterations incorporated).

The first two prongs of plain error review—an error that is plain—are satisfied because Mr. Sanchez was not advised that the government was required to prove he knew he was a felon at the time of the incident. *See Trujillo*, 960 F.3d at 1201. The third prong—an error that affects the defendant's substantial rights—is a different story. The record is replete with evidence that Mr. Sanchez knew he was a felon at the time of the incident:

- Prior to his plea, Mr. Sanchez received three sentences longer than a year. R., Vol. 3 at 60–64.

- At the plea hearing, Mr. Sanchez admitted that before possessing the firearm, he had previously been convicted of "at least one felony offense." Supp. R. at 15.

- At the plea hearing, the district court advised Mr. Sanchez that "[o]n this charge you will *again* lose the right . . . to possess any firearms," to which Mr. Sanchez responded "Correct, correct." *Id*. at 12 (emphasis added).

- In a 2007 repeat offender plea and disposition agreement, Mr. Sanchez was advised that his

convictions for aggravated assault and receiving or transferring a stolen vehicle were felony offenses and the maximum punishments were over a year. Aple. Br. at 75.

- In the same 2007 repeat offender plea and disposition agreement, Mr. Sanchez admitted that he had been previously convicted of the felony offense of aggravated fleeing a law enforcement officer. *Id*.

- In a 2009 repeat offender plea and disposition agreement, Mr. Sanchez was advised that he was pleading guilty to the felony offenses of breaking and entering and embezzlement and that the maximum penalties were eighteen months' imprisonment. Aple. Br. at 69.

- In the same 2009 repeat offender plea and disposition agreement, Mr. Sanchez admitted that he had previously been convicted of a felony offense of aggravated fleeing a law enforcement officer. *Id*.

- Mr. Sanchez's statement, "That's why I ran," indicates that Mr. Sanchez was aware that it was unlawful for him to possess the firearm, so he fled.

This evidence demonstrates that (1) Mr. Sanchez had an extensive rap sheet filled with felonies committed prior to his firearm possession; (2) he was repeatedly advised that he was pleading guilty to felony offenses prior to his firearm possession; (3) he repeatedly admitted that he was a convicted felon prior to his firearm possession; and (4) he received three sentences of imprisonment that were longer than a year prior to his firearm possession. In short, his assertion

-27-

that there is a reasonable probability that had he known of the knowledge-of-status element, he would have gone to trial, is implausible. The government had a mountain of evidence to prove this element, and Mr. Sanchez knew it. His attempt to run the plain error gauntlet accordingly falls short at the third prong because the district court's plain error did not affect his substantial rights.

We therefore affirm the district court's acceptance of Mr. Sanchez's guilty plea.

### D. Sentencing

Finally, Mr. Sanchez argues his prior convictions for aggravated assault with a deadly weapon and residential burglary under New Mexico law do not qualify as violent felonies under the ACCA. If so, that would make his 15-year mandatory minimum ACCA sentence in error. But there is clear Tenth Circuit precedent to the contrary, establishing that both crimes are violent felonies for purposes of the ACCA. *See United States v. Maldonado-Palma*, 839 F.3d 1244 (10th Cir. 2016) (holding New Mexico aggravated assault with a deadly weapon is a crime of violence under the relevant sentencing guideline provision); *United States v. Manzanares*, 956 F.3d 1220, 1227 (10th Cir. 2020), *cert. filed*, Sept. 23, 2020 (No. 20-5774), (holding no reasonable jurist could debate New Mexico aggravated assault with a deadly weapon is a violent felony under the ACCA

based on *Maldonado-Palma*); *United States v. Turrieta*, 875 F.3d 1340 (10th Cir. 2017) (holding New Mexico residential burglary is a violent felony under the ACCA).

We accordingly affirm Mr. Sanchez's sentence.

## III. Conclusion

In light of the above, we AFFIRM the district court on all issues presented on appeal.